## DELTA AIR LINES, INC. *v.* SUMMERFIELD, POSTMASTER GENERAL, ET AL.

NO. 223.

Argued December 9–10, 1953.—Decided February 1, 1954.

*Emory T. Nunneley, Jr.* argued the cause for the Civil Aeronautics Board. With him on the brief was *O. D. Ozment.*

*L. Welch Pogue* argued the cause and filed a brief for petitioner in No. 223.

*Daniel M. Friedman* argued the cause for the United States and the Postmaster General, respondents. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Barnes, Murray L. Schwartz* and *Eugene J. Brahm.*

*Hubert A. Schneider,* on behalf of Braniff Airways, Inc., *C. Edward Leasure,* on behalf of Northwest Airlines, Inc., and *Gerald B. Brophy,* on behalf of Trans World Airlines, Inc., filed a brief, as *amici curiae,* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Delta Air Lines, petitioner in No. 223, is the successor by merger to Chicago and Southern Air Lines (C & S). C & S was an air carrier which conducted both domestic and foreign operations prior to the merger. The present case involves subsidy mail pay for its foreign operations from 1946 through 1950.

In 1948 the Board, on applications made by C & S in 1944 and 1945, fixed a prospective annual subsidy for its domestic operations beginning January 1, 1948, which the Board estimated would yield a net return after taxes of 7.4 percent on that part of its investment allocable to those operations. 9 C. A. B. 786. The following three years—1948, 1949, and 1950—the rates in operation produced a subsidy of more than $654,000 in excess of a 7.4-percent return.

In 1946 C & S applied for subsidy mail pay on its Latin-American routes. On October 18, 1951, the Board issued its opinion and order. Rates were fixed retroactively from November 1, 1946, to December 15, 1950, and prospectively from December 16, 1950. The subsidy awarded was designed to give the carrier a 7-percent re-

76

turn, on the property allocable to foreign operations, after taxes for the past period, and 10 percent for the future. 14 C. A. B. 681.

In fixing the subsidy for the past period, the Board refused to offset against the carrier's need for foreign operations the excess earnings on its domestic flights. It gave two "considerations of economic policy" for that position.[1] First, the Board said it would put

---

[1] The Board said:

"If an offset policy were adopted, the almost invariable result would be that, as in the instant case, the profits from a carrier's domestic operation would be used to sustain any international operations it might have. Recognizing this likelihood, we hesitate to burden the more robust segment of the industry with the obligations of the economically weaker part. For if the domestic air transport system can be kept financially sound, the public must ultimately benefit, putting aside any consideration of the obvious advantage of reduced rates of mail compensation. Thus, we anticipate that if the carriers' earning position continues strong, reductions in the domestic fare level will be possible, thereby giving impetus to the further development of the industry. In addition, with improved earnings, the domestic operators should be able to benefit the public and themselves with more modern aircraft, and with improved methods affording safer and more efficient operations. We cannot escape the thought that if we allow international operations to be carried on the back of domestic operations, we shall be subjecting the latter to an unjustifiable strain. Many of the domestic operators are well along the road to self-sufficiency. It is our duty to speed them on their way, not thwart them.

"It also appears desirable to maintain the comparative status between those domestic operators which have foreign routes as against those which do not have foreign routes. Since carriers fall into fairly well-defined classes, the Board is enabled to fix uniform domestic mail rates for groups of carriers provided, of course, that their comparative status is preserved by excluding consideration of any international operations. A carrier operating under a class rate has every incentive to operate efficiently because it may retain any profits it earns in excess of the estimated return to be afforded by the uniform rate. It is also administratively desirable to preserve a comparative status between carriers because the Board has been

an "unjustifiable strain" on domestic operations if the latter were required to carry the international operations. Second, it concluded that regulatory ends would be better served by maintaining "the comparative status between those domestic operators which have foreign routes as against those which do not have foreign routes."

On the Postmaster General's petition for review the Court of Appeals reversed the Board. 92 U. S. App. D. C. 256, 207 F. 2d 207. The cases are here on certiorari, 346 U. S. 811, and were argued with Nos. 224 and 225, decided this day, *ante,* p. 67.

As we have already noted in the companion cases, § 406 (a) of the Civil Aeronautics Act, 52 Stat. 998, 49 U. S. C. § 486 (a), directs the Board to fix "fair and reasonable rates of compensation for the transportation of mail by aircraft." Section 406 (b) provides that the Board in determining those rates

> "shall take into consideration, among other factors, . . . the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development

---

able to analyze the operations of each carrier within a class in the light of the results achieved by others within the same class. The comparison technique of rate-making has proved to be the most satisfactory and practicable available to the Board. If we were required to fix rates for both domestic and international operations at the same time, it would be difficult, if not impossible, to find a suitable basis for a comparison technique of analysis.

"In view of the foregoing, we find that the earnings from C&S' domestic routes should not be used to offset the 'need' resulting from the carrier's international routes. This conclusion stems from considerations of economic policy; we are not deciding the question of our legal power to make such an offset." 14 C. A. B., at 683.

of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

The mandate is that the Board "shall take into consideration" what "the need" of the carrier is. The Act thus poses as the initial question for the Board whether the financial condition of the carrier is such that it needs a subsidy or has no need for one. The Board did not find that Delta had a "need" for an additional $654,000. It merely concluded that those excess domestic profits should not "as a matter of economic policy" be taken into account in computing a subsidy for international operations. In that posture the decision of the Board seems not in conformity with the law.

The Board answers to the effect that under § 406 (b) it "may fix different rates for different air carriers or classes of air carriers, and different classes of service." It may, therefore, fix a rate for international service. Since it may do that, it may, consistently with rate-making decisions (see, e. g., American Toll Bridge Co. v. Railroad Commission, 307 U. S. 486, 494), fix the rate at a level which will sustain the particular unit. Therefore the Board need do no more under § 406 (b) when it fixes a rate for international service than offset revenue attributable to the class of service for which the rate is made. That is the argument.

There are aspects of traditional rate-making that are carried over into the Act. Thus we held in T. W. A. v. Civil Aeronautics Board, 336 U. S. 601, that rates under the Act are made retroactive only to the date of the application. We also noted in that case that the "need" clause in § 406 (b) is not wholly at war with traditional rate-making functions. Id., p. 604. But the application of the "need" clause which the Board has made in this case is at war with the language of § 406 (b). The stand-

ard is "the need of each such air carrier." The "need" of the carrier is measured by the entirety of its operations, not by the losses of one division or department. The measure of "the need" is an amount of compensation necessary to carry the mail and "together with all other revenue of the air carrier" adequate for maintenance and development. And the Act defines "air carrier" as "any citizen of the United States who undertakes . . . to engage in air transportation . . . ." § 1 (2). Thus the wording of the Act precludes measuring "the need" of the carrier by any other unit than the carrier as an entity.

As we read the Act, Congress has established a special formula for the fixing of a subsidy rate. While the rate may be for a class of service, the return in form of a subsidy must be computed with reference to the entire operations of the carrier. The requirement is that the Board offset all of a carrier's revenues in determining the subsidy; there is no discretion in the Board to disregard any portion of the revenue because of economic or other policy considerations. In other words, an air carrier's subsidy need is an amount which, "together with all other revenue" of the carrier, will enable it to meet and maintain the objectives of the Act. The carrier's "need" is therefore a limiting factor in the sense that the subsidy may not exceed it. Since the Board did not construe and apply the Act in that manner, the Court of Appeals was correct in reversing the rate order.

The Board makes an extended argument of policy against that position in elaboration of the reasons it advanced for not offsetting the excess earnings from domestic operations against the international subsidy rate.[2] It maintains that maximum operating efficiency on the part of air carriers and the development of air transpor-

---

[2] See note 1, *supra.*

tation—prominent objectives of the Act [3]—will be better served by setting subsidy rates on a divisional rather than on a system basis. This may be so. But that is a matter of policy for Congress to decide. As we read § 406 (b), Congress adopted in the present Act a rate formula based on "the need" of the carrier as measured by its entire operations, even when a rate was being fixed for a class of service.

*Affirmed.*

---

[3] Section 2 of the Act provides:

"In the exercise and performance of its powers and duties under this Act, the [Board] shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity—

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(e) The regulation of air commerce in such manner as to best promote its development and safety; and

"(f) The encouragement and development of civil aeronautics."