## WESTERN AIR LINES, INC. *v.* CIVIL AERONAUTICS BOARD ET AL.

NO. 225.

Argued December 9–10, 1953.—Decided February 1, 1954.

*Emory T. Nunneley, Jr.* argued the cause for the Civil Aeronautics Board. With him on the brief was *O. D. Ozment.*

*Hugh W. Darling* argued the cause for Western Air Lines, Inc., petitioner in No. 225 and respondent in No. 224. With him on the brief were *Edward S. Shattuck* and *D. P. Renda.*

*Daniel M. Friedman* argued the cause for the United States and the Postmaster General, respondents. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Barnes, Murray L. Schwartz* and *Eugene J. Brahm.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

These cases, here on writs of certiorari to the Court of Appeals for the District of Columbia, present an important question in the construction of § 406 (b) of the Civil Aeronautics Act of 1938, 52 Stat. 973, as amended, 49 U. S. C. § 401 *et seq.* Section 406 (a) authorizes the Civil Aeronautics Board to fix "fair and reasonable rates of compensation for the transportation of mail by aircraft."[1] Section 406 (b) requires the Board to take into

[1] "The [Board] is empowered and directed, upon its own initiative or upon petition of the Postmaster General or an air carrier, (1) to fix and determine from time to time, after notice and hearing, the fair and reasonable rates of compensation for the transportation of mail by aircraft, the facilities used and useful therefor, and the services connected therewith (including the transportation of mail

consideration, *inter alia,* "the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense." [2]   The con-

---

by an air carrier by other means than aircraft whenever such transportation is incidental to the transportation of mail by aircraft or is made necessary by conditions of emergency arising from aircraft operation), by each holder of a certificate authorizing the transportation of mail by aircraft, and to make such rates effective from such date as it shall determine to be proper; (2) to prescribe the method or methods, by aircraft-mile, pound-mile, weight, space, or any combination thereof, or otherwise, for ascertaining such rates of compensation for each air carrier or class of air carriers; and (3) to publish the same; and the rates so fixed and determined shall be paid by the Postmaster General from appropriations for the transportation of mail by aircraft."

   [2] "In fixing and determining fair and reasonable rates of compensation under this section, the [Board], considering the conditions peculiar to transportation by aircraft and to the particular air carrier or class of air carriers, may fix different rates for different air carriers or classes of air carriers, and different classes of service. In determining the rate in each case, the [Board] shall take into consideration, among other factors, the condition that such air carriers may hold and operate under certificates authorizing the carriage of mail only by providing necessary and adequate facilities and service for the transportation of mail; such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law; and the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

troversy in the present cases turns on the meaning of the words "the need of each such air carrier" and "all other revenue of the air carrier."

Western Air Lines filed a petition for a rate order April 26, 1944. In 1951 the Board finally determined the rate applicable between May 1, 1944, and December 31, 1948. During this open-rate period Western realized some $88,000 in profits from the operation of restaurants and other concessions at airport terminals. The Board determined that this income was "other revenue" available to reduce mail pay. During the open-rate period Western with approval of the Board [3] sold to United Air Lines its certificate and properties for air operations (Route 68) between Los Angeles and Denver, at a profit in excess of $1,000,000. The Board treated the profit derived from the sale of the tangible assets (approximately $650,000) as "other revenue" and reduced the mail compensation by that amount. But it declined to reduce the mail-pay allowance by the profit realized from the sale of the "intangible value" of the route. The Board concluded that that amount should not be used in offset because it wanted "to encourage improvement of the air route pattern through voluntary route transfers by other air carriers." 14 C. A. B., at 246.

On review, Western challenged the inclusion in "other revenue" of the amounts received from the concessions and the profit from the sale of the tangible assets. The Postmaster General [4] challenged the exclusion from the

---

[3] *United-Western, Acquisition of Air Carrier Property,* 8 C. A. B. 298 (1947).

[4] The Postmaster General has not only the duty to pay the mail rates from appropriations for the transportation of mail by aircraft but also is given standing by § 406 (a) to petition the Board to fix and determine the rates. A change in the function of the Postmaster General was made by Reorganization Plan No. 10 of 1953, effective October 1, 1953, 67 Stat. 644.

offsets of the profit Western made on the sale of the intangibles. The Court of Appeals sustained the Board in Western's petition and reversed it in the other petition and remanded the case to the Board for the fixing of a new rate after deducting the entire profit from the sale of Western's Route 68. 92 U. S. App. D. C. 248, 207 F. 2d 200.

Some air-mail rates are service rates, based on mail-miles flown; [5] others are subsidy rates based on "need." We are here concerned with a subsidy rate which in Western's case was fixed so as to produce a 7-percent return on investment after taxes for the period in question. In other words, the end problem concerns not the amount of money provided for operation and development but the amount of profit over and above all such sums.

We read the Act as meaning that "the need" of the carrier which Congress has directed the Board to consider in fixing a subsidy rate is "the need" of the carrier as a whole. The need specified in § 406 (b) is measured by "compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable" it to develop air transportation, etc. The "compensation for the transportation of mail" is flight income. It seems too clear for argument that "all other revenue" would include nonflight income from incidental air-carrier activities. We have found nothing persuasive as indicating that "all other revenue" means transportation revenue. The inclusive nature of the category precludes a narrow reading. If the carrier's treasury is lush, "the need" for subsidy decreases whether the opulence is due to transportation activities or to activities incidental thereto.

By the same reasoning the profit made by Western on the sale of Route 68 is also "other revenue" within the

---

[5] See, for example, *Eastern Air Lines, Mail Rates,* 3 C. A. B. 733 (1942).

meaning of § 406 (b). The Board agrees; but it goes on to say that that is not the end of the matter, since the reduction of the subsidy by the entire amount of the profit is not mandatory. The Act, it is true, merely says that the Board in determining the rate "shall take into consideration" various factors, including "the need" of the carrier (§ 406 (b)); and the "need," as we have noted, is not merely for compensation to insure the transportation of mail but compensation for "the development of air transportation" under the prescribed standards. By that standard the "need" in a given case may be so great that profits from other transactions should be allowed in addition to the normal rate. Or, on the other hand, the total revenues of the carrier as against its operating costs and developmental program may be so great that "the need" for subsidy disappears and the carrier is transferred to the service rate for mail pay. The difficulty here is that the Board, in concluding that a part of the profits from the sale to United should not be used as an offset, forsook the standard of "need" and adopted a different one. The Board wanted "to safeguard the incentive for voluntary route transfers." It thought it could not keep this incentive alive in the industry unless the profit were allowed in addition to the subsidy. The Board thought it important to keep that incentive alive in order to promote route transfers and mergers which the Board could not compel. The Board therefore argues that allowance of the profit over and above a subsidy enables Western "to maintain and continue the development of air transportation" within the meaning of § 406 (b), since the sale of Route 68 was consistent with the development program which the Board deemed desirable.

The Act, however, speaks of "the need" of the carrier for the subsidy, not the effect of a policy on carriers in general. This is not a case of recapture of earnings. Western keeps the entire amount of the profit. The issue

is how much additional money Western is to receive in the form of a subsidy. Western's "need" is the measure of the amount authorized by Congress. No finding was made that there was "need" for the additional subsidy, in the sense that otherwise Western would not have been willing or able to make the transfer of Route 68 in accordance with the development program which the Board deems advisable. Whether such a finding would have satisfied the statutory requirement is a question we do not reach, since the opinion of the Board makes plain that other considerations were controlling:

> ". . . our decision not to include the net profit from the sale of intangibles was reached solely because we are thus seeking to encourage improvement of the air route pattern through voluntary route transfers by other air carriers." 14 C. A. B., at 246.

The standard prescribed by Congress, however, is "the need" of the air carrier whose subsidy rates are being fixed.

*Affirmed.*