**AMERICAN OVERSEAS AIRLINES,**
Inc., Petitioner,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent.

No. 12579.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 11, 1957.

Decided Jan. 23, 1958.

Mr. Elihu Schott, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Messrs. Henry J. Friendly, New York City, and Robert C. Barnard, Washington, D. C., were on the brief, for petitioner. Messrs. Leon Lipson and J. W. Lamberton, Washington, D. C., also entered appearances for petitioner.

Mr. Robert L. Park, Atty., Civil Aeronautics Board, with whom Mr. Franklin M. Stone, General Counsel, Civil Aeronautics Board, Messrs. John H. Wanner and O. D. Ozment, Associate General Counsel, Civil Aeronautics Board, and Mr. Daniel M. Friedman, Atty., Department of Justice, were on the brief, for respondent. Mr. Charles H. Weston, Atty., Department of Justice, also entered an appearance for respondent.

Before PRETTYMAN, WILBUR K. MILLER, and BURGER, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a mail pay case. The Civil Aeronautics Board, pursuant to Section 406 of the Civil Aeronautics Act of 1938,[1] established the amount of compensation to be paid American Overseas Airlines, Inc., for carrying mail for the period January 1, 1946, through September 25, 1950. On this latter date American Overseas was purchased by Pan American World Airways, Inc., and ceased operations. The points presented by the petition for review before us revolve about a pilots' strike in 1947, which grounded the company's planes for eighteen days. Counsel for the Bureau of Air Operations of the Board found the losses or costs due to this strike to be $598,000 and disallowed this amount from the total mail pay claimed by the company. After hearing, the examiner concluded that strike losses were a proper business expense but that return on investment during the strike period should be denied and depreciation and amortization of capitalized interest should be suspended during that period. The Board sustained the position of its Bureau counsel, with the exception of one minor item of $8,000. This adjustment reduced the computed strike loss to $590,000, and the Board disallowed this amount.

The proceeding to fix these mail rates was instituted before the Board in July, 1946. Temporary rates were established, subject to retroactive adjustment when final rates were fixed. This

1. 52 Stat. 998, as amended, 49 U.S.C.A. § 486.

final order was issued December 20, 1954,[2] and amended August 30, 1955.[3] Thus the final determination was prospective in form although retrospective in fact. This procedure is valid.

The pertinent part of the statute is:

"(a) The Board is empowered and directed * * * to fix and determine from time to time * * * the fair and reasonable rates of compensation for the transportation of mail by aircraft * * *.

"(b) * * * In determining the rate in each case, the Board shall take into consideration, among other factors, * * * the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."[4]

The company suffered a deficit in that its actual expenses exceeded its revenues for the period 1946–1947. It claimed as mail pay an amount which represented its "break-even need"—the amount needed to make revenue equal expenses,—and it claimed a return on its investment.

The Board made the disallowance on the ground "that sound public policy requires that we refuse to underwrite losses attributable to a labor controversy without regard to responsibility therefor." The Board says that to allow need pay upon the actual operation in this case would be to underwrite losses occasioned by a labor dispute and that to do this would tip the scales heavily in favor of the company in labor disputes, a function not vouchsafed to the Board by the statute; that losses from such risks are chargeable to capital (that is, against the

7 per cent return allowed the company upon its investment) rather than against operating revenues; that it is not customary public utility rate practice to allow strike losses; that the statute requires need pay to be based upon developmental requirements and strike losses are not developmental in character; and that the company's computation of break-even need would require the Government to pay for mail service not rendered.

The company urged before the examiner and before the Board, and urges here, that a strike cost is like any other cost and is part of the carrier's "need" which must be considered in fixing mail rates, subject only to the statutory standard of "honest, economical, and efficient management". The company says it proved that the strike occurred through no fault on its part. It says its need pay must be measured by the standards of "honest, economical, and efficient management," as the statute prescribes; that the record shows it was in no way responsible for the strike and kept the costs of the strike at a minimum; and that the Board's method would tip the scales heavily in favor of a union in any labor dispute.

Obviously resolution of the issue will be a factor in labor disputes in the air transport industry, no matter which way it is decided, so long as the Board must make its computations for past periods. If it be decided that final mail pay will be based on need shown by actual results of operation over the period of a strike, management will have a defensive cushion against damage from the strike. Its strike losses would be recouped, in part at least, by mail pay. On the other hand, if it be decided that final mail pay over a strike period will be based upon a theoretical computation of net revenues assuming no strike, labor will have an offensive weapon in a dispute with management. A strike would cost the company its strike losses without "need" mail pay as possible recoupment. So, one way

---

2. Order No. E–8833.

3. Order No. 9530.

4. Supra note 1.

or the other, there is no way to avoid an impact of the decision upon labor disputes in the industry, as long as the mail pay question is open for recomputation over the period of strikes.

■ But the statute does not permit mail pay to be determined according to the side of a labor dispute the Government agency may favor. It does not permit mail pay to depend upon Government policies in labor disputes. The Board says the statute does not permit it to tip the scales in favor of management. The statute does not permit it to tip the scales consciously or purposefully either way. The Board should not consider the impact of its determination in these terms.

The Board has twice urged upon the Supreme Court considerations of policy *dehors* the statute. In the Western Air Lines case,[5] the Board did not include in its computation of "other revenue" a net profit achieved by the company upon the sale of intangible assets, solely because it (the Board) sought to encourage improvement of the national air route pattern through voluntary route transfers. We discussed the subject when the case was here,[6] pointing out that the statute contained no provision for the application of industry-wide policies. The Supreme Court affirmed, saying,[7] "The Act, however, speaks of 'the need' of the carrier for the subsidy, not the effect of a policy on carriers in general" and emphasizing that the standard of the statute is the "need" of the carrier. "The difficulty here," said the Court, "is that the Board, in concluding that a part of the profits from the sale to United should not be used as an offset, forsook the standard of 'need' and adopted a different one."[8]

In Summerfield v. Civil Aeronautics Board[9] the Board explained its action "simply as a matter of policy" and "without review of any question of power". This court rejected the Board's contention, saying: "In our opinion failure of the Board to make the offset is at variance with the plain meaning of § 406 (b)." The Supreme Court affirmed.[10] In that Court the Board made "an extended argument of policy" in support of its position. It urged that maximum operating efficiency and the development of air transportation would be better served by setting subsidy rates on a divisional rather than a system basis. The Court said: "This may be so. But that is a matter of policy for Congress to decide."[11]

■ Thus the Supreme Court has twice held that matters of general policy, apart from the terms of this statute, are not to be used as guides for decision. The same rule applies here. A general policy as to labor disputes is not a factor to be considered in the determination of mail pay under this statute.

■ We look at the statute very carefully. We have quoted the pertinent portion. The basic, controlling provision is in the words beginning "to maintain and continue the development". The objective of the Congress is plain. It is the maintenance and continued development of air transportation to the extent and of the quality required for the national commerce, postal service, and defense. The objective is on a grand scale. It is for the public interest. It is vital. The words used are important, because they depict with clarity a congressional policy. Moreover the payment is "to enable such air carrier". Congress did not put the responsibility for development of an air transportation system wholly upon Government agencies. In this statute the

5. Western Air Lines, Inc., v. Civil Aeronautics Board, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1954).

6. Summerfield v. Civil Aeronautics Board, 92 U.S.App.D.C. 248, 253–254, 207 F.2d 200, 205–206 (1953).

7. Supra note 5, 347 U.S. at page 72, 74 S. Ct. at page 349.

8. Ibid.

9. 92 U.S.App.D.C. 256, 207 F.2d 207 (1953).

10. Delta Air Lines v. Summerfield, 347 U.S. 74, 74 S.Ct. 350, 98 L.Ed. 513 (1954).

11. Id., 347 U.S. at page 80, 74 S.Ct. at page 354.

Congress sought to utilize the abilities and the capacities of the private air carriers. The purpose of the compensation is to enable the carriers "to maintain and continue the development". Maintenance of an adequate air transportation system is one purpose. Continued development is the other—not merely development but continued development.

Congress proposed to supply the funds for this program through the conduit of mail pay. Carriers are to be paid compensation for carrying the mail, not only in amounts sufficient to recompense them for the service but also in amounts needed for the broader, bigger program in the national interest. The need which the statute seeks to meet is not the need of the carrier for funds for its own private purposes, for its own operation or profit. It is the need of the carrier for funds to enable such carrier to carry on for the purposes depicted by the Congress in the interest of the nation.

■ Two subsidiary tests are included in this provision of the statute. One is that the need of the carrier for these funds must be measured against all other revenue of the carrier. This subject was explained by the Supreme Court in the Western Air Lines and Delta Air Lines cases, supra. The other test is that the need must be measured against honest, economical and efficient management. This is a factual, not a speculative, test. Moreover honesty, economy and efficiency are broad terms of varied factual content; they are not terms of mathematical precision. Many different operations— different in policy, in mode, and in result —may all be honest, economical and efficient. It is not enough for the Board to say that an operation it designs and favors meets those tests and it will approve that course and none other. The operation by the company may also be honest, economical and efficient. The statute contemplates, we think, that the figures, past or prospective, of the operation of the carrier in question be used unless some item or items are due to dis-

honest, inefficient or uneconomical management. In such event the Board must make a finding to that effect. We have no such finding in the case at bar, and therefore we need not here consider the practical application of this test.

■ The Board characterizes need pay as a subsidy. And so it is, no doubt. The Supreme Court so characterized it in the Western and Delta cases. But the subsidy is for public purposes. Congress wanted to use public money to achieve an airline system of the extent and of the character and quality required for three named purposes. It said just that. And the function of the Board is directed to and circumscribed by that prescription. The Board has, and can have, no legislative power. It cannot write formulae for mail pay on its own ideas. It is bound by the purposes and the intentions of the Congress. Congress has the power to grant subsidies, and it did so in this instance.

■ The statute obviously contemplates as a usual procedure the fixing of rates for the future. This is the customary method in fixing public utility rates. The statute, as the Supreme Court pointed out in Western and in Delta, imports some of the concepts of ordinary public utility rate-making. But, plainly due to the rapid, novel, unforeseeable development of air transportation, rates which would be fair compensation could not be accurately forecast, and the Board wisely and properly entered upon a system of fixing temporary rates for future periods and then, after a period was past, re-examining the situation and making a final determination. In looking at the past the Board, as we pointed out in the Western Air Lines case when it was in this court,[12] must act in the light of known facts. We must construe the statute in respect to a determination of future rates and also in respect to a determination of compensation for periods factually past. The two situations present different problems.

12. Supra note 6.

If the rates are being fixed for the future, allowance of expenses or losses for possible strikes in that future period is not usual. And it is not proper. It is not wise policy for the regulatory authority to cushion a company in advance against unforeseen events which are not ordinary or necessary in the sense that ordinary and necessary expenses are forecast in a prospective rate case.

But our problem concerns a past period. What sums does a carrier need to enable it to maintain and continue to develop an air transportation system in the prescribed statutory purposes, if it has in fact experienced a deficit in revenues due to a strike?

If the strike would not have occurred under honest, economical and efficient management, compensation for losses from that strike is barred by the statutory test to which we have referred. But, if the strike would have occurred, and did occur, despite honest, efficient and economical management, compensation is not barred by that test. The Board has not made a finding upon that point in the case at bar. But, even if a finding be made that the strike occurred regardless of blameless management, the problem still remains as to the amount of the need of the carrier for funds sufficient to enable it to maintain and to continue to develop, etc. This latter is a question of fact to be determined in each case. The Board must make that finding and the subsidiary findings necessary to its support.

The problem we have here was before the Supreme Court in the Western Air Lines case but upon the converse in facts. There the company had had in a past period an unforeseen profit upon a sale of some capital assets. It urged that in fixing rates for public utility purposes regulatory bodies do not contemplate such profits or make deductions from rate revenues for them. The Board resisted that view, and the Supreme Court supported the Board. The Court held with emphasis that the standard of the statute is the need of the carrier in the light of

the statutory objectives and, when a past period is under review, of the facts. It affirmed the inclusion of the capital profit as revenue in the computation. This is a rule which works both ways. Just as an unforeseen and unusual profit in a past period must be treated as a fact, so must unusual and unforeseen costs or losses be treated as facts. The statutory standard in either case is the need of the carrier.

If a company has actually suffered a deficit due to a strike, or has sustained losses, it may well be in such a position as to be unable to maintain, much less continue to develop, air transportation service of the extent and quality required for the statutory public purposes, unless those losses are recouped. Its situation as a practical matter is not different from what it would be if the cause of the loss were an unforeseen hurricane, tornado or flood. On the other hand it is conceivable that losses or costs due to a given strike had no impact upon the carrier's capacity for service under the statutory standards. It may be that strike costs and strike losses in a given instance are of such nature and amount that they can and should be charged against the return allowed the company as profit on its investment. Such return may be, or may have been, fixed prospectively, with the idea in mind that it will cover unforeseen or non-recurrent losses. Sometimes the allowance of such a margin acts as an incentive to management to avoid all avoidable costs. The answer depends upon the facts as to the allowance of the return and also its results. These are matters upon which the Board must make determinations, and those determinations must be supported by findings of the facts.

It is obvious that the company cannot use for maintenance and development funds it does not have. If, by reason of a storm, or adversity, or any other cause, a company's revenues are less than they would have been had the catastrophe not occurred, a computation of what the revenues might have been does not supply funds. The purposes of the statute

are not met merely by making such a computation. Those purposes are not served by pointing out to a company what funds it might have had but does not have.

■ Pertinent questions are: What part in the commerce of the United States, the postal service, and the national defense should this company play? What part is it able to play? If the problem is in the past, and the company has played a part which was proper for it to play in these purposes, the questions are: What did the operation cost the company? What money does it need in addition to all of its other revenue? If the rates are for the future the questions are: What part will and should the company play? What revenues will it need for those purposes? What revenues will it have? These questions involve consideration of the nature and extent to which maintenance and development of the particular company would contribute to the statutory purposes and what moneys the company would need, under honest, efficient and economical management, in addition to all of its other revenues, to achieve those objectives.

■ As we suggested in the Western Air Lines case, the casting of the problem of need mail pay into an accounting computation, and no more, tends to confuse the issues and to obscure the basic controlling standards. It tends to cause one to be guided entirely by the merits or demerits of accounting credits or debits. Of course, in an examination of the revenues of a company and the revenues it may need for the stated purposes, accounting analysis and synthesis are necessary. But they must not be permitted to exclude from control the terms of the statute.

■ The problem at hand is whether, in determining the revenues over and above which this company's need must be determined, the Board should act upon the facts as they were, i. e., a strike period, or upon an optimum basis eliminating the strike results. That decision should be made without reference to or consideration of the general policy of favoring one side or the other in the labor controversy. The question should be decided by applying the standards prescribed in the statute. What the answer will be upon that consideration we do not know and do not intend to imply. Such consideration and decision are for the Board in the first instance. The case will be remanded for that purpose.

■ Before the examiner and before the Board there was an acute dispute concerning the computation of the strike losses—"costing the strike". The point was not presented here, either in briefs or in argument. We therefore shall not pass upon it.

Remanded.