**DELTA AIR LINES, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
Respondent.

No. 15084.

United States Court of Appeals
District of Columbia Circuit.

Argued April 4, 1960.

Decided June 2, 1960.

Petition for Rehearing Denied
July 13, 1960.

Mr. James F. Bell, Washington, D. C., with whom Messrs. R. S. Maurer, Atlanta, Ga., George C. Neal, Washington, D. C., and Calvin Davison, Washington, D. C., were on the brief, for petitioner.

Mr. Morris Chertkov, Attorney, Civil Aeronautics Board, with whom Messrs. Franklin M. Stone, General Counsel, Civil Aeronautics Board, John H. Wanner, Deputy General Counsel, Civil Aeronautics Board, O. D. Ozment, Associate General Counsel, Litigation and Research, Civil Aeronautics Board, and Richard A. Solomon, Attorney, Depart-

ment of Justice, were on the brief, for respondent.

Before PRETTYMAN, Chief Judge, and WILBUR K. MILLER, and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

This is the second appeal involving efforts of the Civil Aeronautics Board to fix mail-pay rates for the international operations of Chicago & Southern Airline ("C & S"), subsequently merged with Delta Air Lines ("Delta"), petitioner here.

Mail rates may include a subsidy based on need,[1] as well as compensation for services performed. The purpose of the subsidy is to promote the development of air transportation to the extent required by interstate commerce, the postal service and national defense. Mail rates are usually set prospectively, on the basis of estimated revenues and expenses.[2] When so established, mail-pay rates, like ordinary utility rates, run for an indefinite period, subject to reopening at any time. If, however, a carrier performs services during a period for which no final rate has been previously determined, the Board in setting rates for that past period need not "ignore the known fact[s] and compute the rate as though it were looking at the unknown future as of the date of the beginning of the period."[3] Instead it may set such rates retrospectively on the basis of act-

ual operating results. This method is, in effect, "cost plus" compensation.[4]

The former appeal was from the Board's order of October 18, 1951, fixing new *international* rates on a prospective basis, effective December 16, 1950. At the time that order was entered, several years of actual operations had transpired under the then effective *domestic* rate. This experience revealed profits well in excess of those estimated when that rate was originally set on a prospective basis. The Board refused the Postmaster General's request to "offset" these past excess domestic profits against the new international rate. The Postmaster General appealed. We sustained his position, set the order aside and remanded the case with directions "to determine and fix the rates in accordance with this opinion."[5] The Supreme Court granted certiorari, and affirmed.[6]

On remand, hearings were held to determine the amount of excess profits on the domestic division to be offset against the international mail rate. After hearings before the Examiner and shortly before oral argument to the Board, the Board sua sponte raised the additional question of whether the international rate itself, against which the set-off was to be applied, should be recomputed on a past-period basis. By that time, the international rate period commencing December 16, 1950 had been closed as of July 31, 1952, and complete figures based

1. See § 406 of the Federal Aviation Act of 1958, 72 Stat. 763, 49 U.S.C.A. § 1376. This section formerly appeared as § 406 of the Civil Aeronautics Act of 1938, 52 Stat. 998. The repeal and reenactment did not effect any changes significant for present purposes.

2. Transcontinental & Western Air v. Civil Aeronautics Board, 1949, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911.

3. Summerfield v. Civil Aeronautics Board, 1953, 92 U.S.App.D.C. 248, 207 F.2d 200, 204, affirmed 1954, sub nom. Western Air Lines v. Civil Aeronautics Board, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 339.

4. Transcontinental & Western Air v. Civil Aeronautics Board, supra, 336 U.S. at page 606, 69 S.Ct. at page 758.

5. Summerfield v. Civil Aeronautics Board, 1953, 92 U.S.App.D.C. 256, 258, 207 F. 2d 207, 209, 210, affirmed sub nom. Delta Air Lines v. Summerfield, 1954, 347 U.S. 74, 74 S.Ct. 350, 98 L.Ed. 513.

6. Delta Air Lines v. Summerfield, 1954, 347 U.S. 74, 74 S.Ct. 350, 98 L.Ed. 513.

   The Supreme Court pointed out that the governing provision of the statute concerns the "need of each such air carrier for compensation" and that the need of the carrier as "measured by the entirety of its operations" is "therefore a limiting factor in the sense that the subsidy may not exceed it." 347 U.S. at page 79, 74 S.Ct. at page 353.

upon actual operating experience were thus available for the full period. These figures disclosed a 36 percent rate of return—26 percent more than was estimated. The Board decided, over sharp dissent, that under our remand its inquiry was not limited to the question appealed and that it was free, if not required, to redetermine the proper rate on the basis of actual operating results. Delta brought the present petition to review this action.

Petitioner challenges the Board's power to reopen the entire rate question, and further contents that, even if the Board had the power, its exercise in this case was arbitrary and an abuse of discretion.

Underlying these contentions is Delta's assertion that its merger with C & S, while the former appeal was pending, proceeded upon the assumption that the C & S international *rate* was final, subject only to a possible set-off; and that it is unfair for the Board to retroactively alter a situation upon which its stockholders, suppliers, financiers and the stock-purchasing public relied.

More specifically, the Board is said to have exceeded its power because (1) the issue of excess profits under the new international rate could have been, but was not, raised and tested upon the prior review, and (2) the mandate of this court, directing the Board "to determine and fix the rate in accordance with this opinion," precluded the Board from considering, de novo, questions not dealt with in our opinion.

With respect to the first argument, it is true that by the time the international rate, effective as of December 16, 1950, was entered in October of 1951, the Board and the Postmaster had available operating figures for at least part of the already elapsed ten-month period of operation under this new rate.[7] But at the time the Postmaster filed his petition for review (March 1952), the international rate was still in effect for an indefinite period. Even if the early operating experience showed an excessive return, the Postmaster could have refrained from challenging the basic rate on the reasonable assumption that further operating experience might be less profitable, thus rendering the average rate for a longer period fair and reasonable.

Moreover we agree with the Board that, even if the Postmaster could, as a practical matter, have challenged the rate level upon the prior review, his failure to do so did not, by itself, estop or foreclose the Board from reconsidering the matter on remand in the light of subsequent events. See St. Joseph Stock Yards Co. v. United States, 1935, 298 U.S. 38, 62–64, 56 S.Ct. 720, 80 L.Ed. 1033; Panhandle Eastern Pipe Line Co. v. Federal Power Comm., 3 Cir., 1956, 236 F.2d 289. See generally, 2 Davis, Administrative Law § 18 (1958).

Delta's second argument, that our mandate denied the Board power to reconsider questions not raised on the first appeal, relies upon cases which hold that questions not raised upon appeal are foreclosed upon remand to a lower court;[8] and, in particular, upon Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 1932, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348, which holds that the Interstate Commerce Commission cannot reopen a final rate determination and retroactively apply a lower rate.

The Board rejected these arguments on the authority of Federal Communications Comm. v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656. In that case, Pottsville appealed to this court from the Commission's denial of its license application. We reversed on the ground that the Com-

7. The international rate here under review remained in effect until July 31, 1952, a total of 19½ months.

8. See, e. g., Sprague v. Ticonic Nat. Bank, 1939, 307 U.S. 161, 168, 59 S.Ct. 777, 83 L.Ed. 1184 (dictum); Sorensen v. Pyrate Corp., 9 Cir., 1933, 65 F.2d 982, certiorari denied 1933, 290 U.S. 689, 54 S.Ct. 124, 78 L.Ed. 593.

mission had misinterpreted state law, and remanded for reconsideration in light of the applicable legal principles. While judicial review was pending, however, the Commission had received and processed two rival applications for the same facility. After our remand, the Commission consolidated the other applications and Pottsville's for oral argument, to determine which of the three would best serve the public interest. Pottsville then obtained a writ of mandamus from this court requiring the Commission to follow the mandate by determining Pottsville's qualifications on the original record, and not on a comparative basis. The Supreme Court reversed, holding that the institutional characteristics of administrative agencies charged with protecting the public interest "at all times" require far greater flexibility and discretion upon remand than is the case with lower courts. The Court recognized that this rule might work hardship in individual cases, but concluded that Congress had largely confined to the agency the job of weighing such hardships against the requirements of the public interest.

We agree with the Commission that the principles underlying Pottsville are applicable here. Considerations of administrative flexibility apply to airline subsidy as well as licensing proceedings, for the Board, like the Federal Communications Commission, is required "at all times" to gauge its actions by the public interest standard.[9]

Petitioner likens this case to an ordinary utility rate proceeding, and contends that the application of the nonfinality principle of Pottsville in such proceedings would produce chaos. We cannot agree with the premise of this argument. "[U]tility rates apply to a multitude of customers; the air-mail rate is paid by only one—the Government. Utility services must be paid for currently; air-mail payments can be and are being paid in lump sums on account of items long past." Transcontinental & Western Air v. Civil Aeronautics Board, 1949, 336 U.S. 601, 608, 69 S.Ct. 756, 760, 93 L.Ed. 911 (Jackson, J., dissenting).[10]

Nor do we agree with Delta's claim that it emerged from the former review with a legitimate expectation that the rate would not be reopened. True, the Supreme Court has held that mail-pay rates, like railroad freight rates, once final, cannot be reopened. Transcontinental & Western Air v. Civil Aeronautics Board, supra; Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., supra. Indeed the primary consequence of "finality" seems to be that the rate cannot be reopened. But here the rate order was not final. We set it aside and remanded the case to the Board for further proceedings. Rather than supporting Delta's contention, we think that these cases support the view, at least by implication, that the Board has power to re-examine non-final rates.[11]

9. Although § 406 of the Federal Aviation Act does not refer to the "public interest" as such, the Board is authorized to award subsidy mail pay in order to promote aviation to the extent required by interstate commerce, the postal service and national defense. 72 Stat. 763, 49 U.S.C.A. § 1376. These objectives, as well as the expenditure of Government funds, make public interest considerations implicit.

10. The majority held in Transcontinental & Western that mail subsidy rates *were* to be likened to utility rates for the purpose of determining whether a *final* rate could be reopened. But we do not think that it is inconsistent with that holding

to recognize the distinctions described by Mr. Justice Jackson for the purpose of determining whether the Pottsville doctrine applies to a *non*-final mail rate.

11. Petitioner also contends that the Board erred in offsetting, against the international rate, excess profits earned in the domestic division in periods subsequent to those mentioned in the former appeal. This contention must fail. The need of the carrier as a whole is the governing factor in setting mail-pay subsidies. Delta Air Lines v. Summerfield, 1954, 347 U.S. 74, 74 S.Ct. 350, 98 L.Ed. 513. As long as the international rate was still open, the Board did not err in using the most recent returns on the domestic

We do not suggest that Delta and its associates did not *in fact* rely upon the finality of the international rate. Like Pottsville, Delta may well be in a worse position than it would have been if the Board had not erred in the first place. See Pottsville Broadcasting Co. v. Federal Communications Comm., 1939, 70 App.D.C. 157, 162, 105 F.2d 36, 41. But the Supreme Court, recognizing that hardship can result from the Pottsville doctrine, nevertheless concluded that the agency is the primary tribunal to balance these hardships against the demands of the public interest. Federal Communications Comm. v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 146, 60 S.Ct. 437, 84 L.Ed. 656. It has done so here.

What we have said with respect to the Board's power is sufficient to dispel petitioner's claim that the Board abused its discretion in exercising that power.[12]

██ One question remains for our consideration. The Board decided that, in recomputing the proper mail-pay rates for the period December 16, 1950 to July 31, 1952 on a past-period basis, it would adhere to its former determination that a 10 percent return is all that C & S needed, even though the return was recomputed on a past-period basis. Delta now attacks the Board's original findings that 10 percent is a proper return on the grounds that this ultimate determination is not supported by subsidiary findings which rationally support the conclusion. We have carefully considered these contentions and find no basis for disturbing the Board's findings. Its thorough and well-reasoned opinion on this phase of the case renders further discussion by us unnecessary.

Affirmed.

division to determine the amount to be set off.

12. Delta points out that, even if we find that the Board had discretion in the matter, the Board found itself compelled by the Supreme Court's decision in West Ohio Gas Co. v. Public Utilities Comm., 1935, 294 U.S. 79, 55 S.Ct. 324, 79 L. Ed. 773, to reopen the entire rate issue. It therefore argues that, unless we

agree with the Board's reading of West Ohio, we must remand with directions to reconsider whether or not to exercise its discretion. We do not reach the question of whether or not the Board was required to reopen the rate question, or whether failure to do so would be an abuse of discretion, for we think that its opinion clearly indicates that, even if it were not required to reopen, it would do so in the exercise of sound discretion.