NORTHWEST AIRLINES, INC.,
Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent.

No. 18510.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 21, 1964.

Decided Dec. 3, 1964.

Mr. Robert N. Duggan, Washington, D. C., with whom Mr. James L. Kaler, Washington, D. C., was on the brief, for petitioner.

Mr. Frederic D. Houghteling, Attorney, Civil Aeronautics Board, with whom Asst. Atty. Gen. William H. Orrick, Jr., Messrs. John H. Wanner, General Counsel, Joseph B. Goldman, Deputy General Counsel, O. D. Ozment, Associate General Counsel, Litigation and Legislation, Civil Aeronautics Board, and Lionel Kestenbaum, Attorney, Department of Justice, were on the brief, for respondent.

Before FAHY, WASHINGTON and BURGER, Circuit Judges.

FAHY, Circuit Judge:

Northwest Airlines petitions for review of an order of the Civil Aeronau-

tics Board establishing for the year 1954 a final rate of compensation to be paid to it, under Section 406 of the Federal Aviation Act,[1] for the transportation of mail in Northwest's International operations. Section 406(a) empowers the Board to fix "the fair and reasonable rates of compensation for the transportation of mail by aircraft * * *", and Section 406(b) provides that in so doing the Board shall take into consideration, among other factors not now pertinent,

> "the need of each such carrier * * for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

In arriving at the rate under these provisions the Board, after procedures which are now unchallenged, fixed the final 1954 rate at a figure which required Northwest to refund some $1,833,000 of the amount which it had previously received as subsidy mail pay under temporary rate orders.

As now submitted by Northwest for review by this court the contentions are (1) the Board erred in its handling of depreciation allowances applicable to certain airplanes, including in that connection the Board's omission to make findings said to be required by our decision in American Overseas Airlines, Inc. v. CAB, 103 U.S.App.D.C. 41, 46, 254 F.2d 744, 749 (1958) and (2) the Board applied to Northwest's unsubsi-

dized domestic division standards applicable to a subsidized division, with particular reference to depreciation adjustments and the rate of return upon the basis of which the Section 406 rate was determined.

As to the matter of depreciation, Northwest had depreciated its B-377 planes as though their service life were 7 years with a residual value of 10 per cent of the original cost. The Board concluded that the depreciation should have been on the basis of a service life of 8⅓ years with a residual value of 15 per cent of original cost. Similar adjustments were reached respecting the depreciation of some of Northwest's other planes. The difference, as reflected in Northwest's revenues, with adjustments not necessary to be discussed, led to a reduction in the amount which the Board on the one hand, and Northwest to the contrary, concluded was Northwest's need for 1954 under Section 406.

▆ There is no doubt the actual service life of the planes was more than 8⅓ years,[2] and we are presented with no persuasive reason for overruling the Board in allowing depreciation on that basis. The principal reason to the contrary advanced by Northwest is that the Board did not make an essential finding, namely, that the depreciation figures used by Northwest in its 1954 operations do not represent "honest, economical and efficient management," language found in Section 406. It relies upon the following statement in our opinion in *American Overseas Airlines, supra*:

> "The statute contemplates, we think, that the figures past or prospective, of the operation of the carrier in question be used unless some item or items are due to dishonest,

1. 72 Stat. 763, 49 U.S.C. § 1376 (1958), as amended, 76 Stat. 145 (1962), 49 U.S.C. § 1376 (Supp. V, 1959–63).

2. The record indicates that the planes were in service for a period of about 10 years and were sold for some 32.5 per cent of their original cost.

The service life of 8⅓ years finds its basis in previous Board decisions in which it had fixed December 31, 1957, as a common retirement date, for depreciation purposes, of post-war piston aircraft acquired prior to 1950. The aircraft involved in this case were of that type.

inefficient or uneconomical management. In such event the Board must make a finding to that effect."

■ This statement was made with reference to a particular item of loss due to a strike on the airline. The question was whether the strike, and consequently the loss, was due to "dishonest, inefficient or uneconomical management." If so the loss was not to be allowed in determining the need upon the basis of which the Section 406 rate was to be fixed. In the present case, however, the controversy is not whether mismanagement led to an item of actual expense, but whether a proper yardstick of depreciation was used in determining revenue needs under Section 406.[3] There is more than one method of depreciation which may be honest, economical and efficient. The method to be approved in such a case as this is peculiarly within the decisional province of the rate-making authority. The Board may prescribe a different method from that used by the carrier without finding that the carrier's method was due to dishonest, uneconomical or inefficient management. Such a difference is not a "management" difference.

The Board took into consideration the undisputed fact that the planes had a substantially longer service life than that used in Northwest's depreciation account. In fixing rates for a past period the Board may take into account actual experience. See Delta Air Lines, Inc. v. CAB, 108 U.S.App.D.C. 88, 90, 280 F.2d 636, 638, cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 94 (1960). Moreover, the method used provides depreciation charges which allowed Northwest to recoup its actual investment in the planes. We therefore find no reason to disagree with the Board in recalculating these cost figures of the carrier, correspondingly reducing its compensation need. It was not necessary for the Board, in not accepting the carrier's rate of depreciation, explicitly to find that its rate was due to other than honest, economical or efficient management.[4]

Northwest further contends that although it received no subsidy in its domestic division in 1954 the Board has treated this division, "in screening it for excess earnings," as though it were subsidized, notwithstanding that the Board has developed different standards for subsidized and unsubsidized operations respecting depreciation practices and rate of return so as to reflect the difference in risk involved. The "screening" for "excess earnings" refers to the requirement set forth in Delta Air Lines, Inc. v. Summerfield, 347 U.S. 74, 79, 74 S.Ct. 350, 353, 98 L.Ed. 513 (1954), that the Board in fixing subsidy rates for one division of a carrier must "screen" the "entire operations of the carrier. The requirement is that the Board offset all of the carrier's revenues in determining the subsidy * * *."

■ This objection of Northwest is not to be decided in terms of whether or not the Board has treated Northwest's domestic division as though it were subsidized. Whether the amount screened off from the revenues of the domestic division was excessive is to be determined by the result. As to this we are advised that the parties agreed that a 7 per cent return on the operations of the international division was adequate

3. No question is raised as to the adequacy of the findings as to the need of the carrier except as discussed in our consideration of American Overseas Airlines, supra.

4. As to the suggestion of Northwest that the Board should have used the "remaining life" method of adjusting depreciation charges, rather than the "full-life" method, this involves a contention phrased now as a legal one but which may more appropriately be regarded as a question of choice between accounting methods. The Board fully considered the problem in the context of the present case. Its choice of method, and its reasons therefor, are persuasive against the reasons advanced for a different decision on this technical matter. On this record the court would not be warranted in overruling the decision of the expert body.

to meet the need of Northwest under Section 406; and the Board found that for purposes of determining the amount of excess domestic revenues available Northwest was entitled to an 8 per cent return on its domestic operations for the period relevant to these proceedings. After screening earnings from the actual revenues of the domestic division to enable the international operations to show a return of 7 per cent, the carrier's domestic operations, considered alone, would show a return of 11.68 per cent.[5] Thus, even after the screening, Northwest showed domestic earnings substantially in excess of the 8 per cent return found to be reasonable. The Board accordingly concluded that Northwest was not entitled to a subsidy for 1954. Moreover, in order to bring the situation in line with the carrier's need as found by the Board refund of payments previously made under temporary mail orders was required. Northwest does not convince us of the invalidity of this result. Its argument, based on references to other decisions of the Board, not before us for approval or disapproval, such as the General Passenger Fare Investigation, 32 C.A.B. 291 (1960) where quite different matters were being determined, does not serve to undermine the rate the Board here prescribes as adequate for Northwest to meet its need under the terms of Section 406.

█ The Board's decision fully considers the factors urged by Northwest, and fully analyzes the Board's own precedents in their relation to this case. Moreover, as the Board points out, Northwest is required by the order to surrender only excess subsidy payments; that is, it retains its profits on its commercial operations and its service mail pay. We assume, as Northwest contends, that its domestic division, in contributing excess earnings in the Board's process of arriving at the Section 406 rate, must be permitted to maintain standards which take into account the carrier's needs to develop and fulfill its entire obligations, along with the risks involved; yet we are not shown by Northwest that the Board's order will prevent this.

Affirmed.

5. The adjusted figures for Northwest as computed by the Board are as follows:

