**TRANS WORLD AIRLINES, INC.,**
Petitioner,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent.

No. 19408.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 24, 1966.

Decided Sept. 12, 1967.

Mr. Charles Pickett, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Warren E. Baker, Washington, D. C., was on the brief, for petitioner.

Mr. Frederic D. Houghteling, Atty., C. A. B., with whom Asst. Atty. Gen. Donald F. Turner, Messrs. Joseph B. Goldman, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Atty., C. A. B., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief, for respondent. Mr. Lionel Kestenbaum, Atty., Dept. of Justice, and Mr. John H. Wanner, Gen. Counsel, C. A. B., at the time the record was filed, also entered appearances for respondent.

Before DANAHER, WRIGHT and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case involves a petition by Trans World Airlines, Inc. (TWA) for review of certain orders of the Civil Aeronautics Board (Board), notably E–22022, entered April 2, 1965, which determined a final subsidy mail rate for TWA's transatlantic operations for the years 1946–1953. The determination was pursuant to Section 406 of the Civil Aeronautics Act of 1935, which has been carried over without substantial change into Section 406 of the Federal Aviation Act of 1958.[1]

The Board fixed TWA's international mail pay for those years at $48,633,000—

---

[1] 72 Stat. 763, 49 U.S.C. § 1376 (1958), as amended, 76 Stat. 145 (1962), 49 U.S. C. § 1376 (1964). Section 406 provides in pertinent part:

(a) The Board is empowered * * * to fix and determine * * * the fair and reasonable rates of compensation for the transportation of mail * * *.

(b) In fixing and determining fair and reasonable rates of compensation under this section * * * the Board shall take into consideration, among other factors * * * the need of each such air carrier * * * for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense.

$22,375,000 in "service" (compensatory) pay and $26,258,000 in subsidy. Since TWA actually received $50,875,000 in temporary mail pay for these years, the Board's order required it to refund $2,152,000. TWA contests eight rulings of the Board and contends that the Board owes TWA more than $9,000,000 in additional subsidy.

## A. Introductory
### Statutory framework of subsidy mail pay.

The terms "service" and "subsidy" do not appear in the Act but are widely used to describe the different forms of mail pay provided in Section 406. The "service" mail rate, paid by the Postmaster General, compensates carriers for transportation of mail, and is based on the cost of performing mail service including cost of equipment used and a fair return on the capital allocable to the mail service. In addition the Board makes "subsidy" payments to mail-certificated carriers whose operations are not self-sustaining on the basis of commercial revenues and service mail pay. Section 406(b) provides that the "subsidy" is based on:

> the need of each such air carrier [other than a supplemental air carrier] for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense.

The subsidy comprehends what the carrier "needs" for "development," as well as for current operations, and for non-mail service as required for our commerce and national defense. A service rate applies only to mail carried, while the subsidy is based on miles flown. During the period involved service rates were based on costs of all carriers in the group, while the subsidy mail rate was based on the financial needs of each carrier. The amount of service mail pay, established at a group rate of 85 cents per ton mile for mail carried, is not contested in this case.

### Prior proceedings.

TWA, originally a purely domestic carrier, began transatlantic operations in February 1946, and established a separate international division for this purpose. At that time, it was the Board's practice to treat such separate operating divisions as independent rate-making units and to fix domestic and international mail rates in separate proceedings. When TWA began its transatlantic operations, the Board set temporary subsidy mail rates for them, and as already noted these eventually yielded $50,875,000 for the years in question.

In July 1946 proceedings were commenced to establish a final transatlantic subsidy rate for TWA. In January 1952, after lengthy informal proceedings and on TWA's petition, the Board consolidated TWA's case with the transatlantic subsidy cases of Pan American World Airways and American Overseas Airlines (AOA). In March 1954, the Examiner rendered his Initial Decision in the consolidated cases,[2] as to the period 1946–1952. By Orders E–8833 and E–9530, entered December 20, 1954, and August 30, 1955, the Board extended the Examiner's findings through 1953 on the basis of more recent data, revised several of his rulings, and concluded that TWA's international "need" for 1946–1953 was some $500,000 in excess of the temporary mail pay received.

Meanwhile, in Delta Air Lines v. Summerfield,[3] decided earlier in 1954, the Supreme Court held that in determining whether there was 406 need qualifying

---

2. Transatlantic Final Mail Rate Case, C.A.B. Dkt. No. 1706 et al. Initial Decision of R. Vernon Radcliffe, Examiner (March 26, 1954).

3. 347 U.S. 74, 74 S.Ct. 350, 98 L.Ed. 513 (1954).

a carrier for subsidy pay, the Board could not base rates on the "need" of only one division but must take into account the operations of the carrier as a whole, offsetting against the "need" of one division any "excess profits" earned by another division. In September 1954 the Board instituted the so-called "offset" phase of the case to determine if there were excess earnings by TWA's domestic division during the 1946–1953 period.[4] The "offset" hearings overlapped the final stages of the "transatlantic" case. Any excess earnings in the domestic division were to be balanced against the determined need of the transatlantic division in order to arrive at what was net "406 need" under the *Delta* principle. By Orders E–10117 (March 23, 1956) and E–10176 (April 9, 1956), the Board came to the same conclusion as the Initial Decision of (another) Examiner issued November 23, 1955, that TWA's domestic division had excess earnings of $4,183,000, which must be used to offset its international "need" for compensation. This became translated into $8,715,000 available to reduce subsidy requirements because of the 52 per cent tax effect. The Board fixed TWA's net international mail pay after offset at $42,942,000, and ordered an $8,153,000 refund of temporary mail pay.

On petition for review this court, on January 23, 1958, without reaching the merits, set aside the Board's mail pay determinations as to TWA because the Board Chairman participated in the decision of the so-called "deferred tax" issue after having been of counsel for the Post Office during an earlier phase of the case. Trans World Airlines v. CAB, 102 U.S.App.D.C. 391, 254 F.2d 90 (1958). As to AOA, the court held that the Board's disallowance of strike losses was based on a misconstruction of the statute. American Overseas Airlines v. CAB, 103 U.S.App.D.C. 41, 254 F.2d 744 (1958).

On remand, new hearings were held but by agreement the only issues reopened were those involved in this court's decisions: the "strike loss" issue, in both the transatlantic and offset phases, and the "deferred tax" issue in the offset phase. The "strike loss" issue was determined in TWA's favor in part, and the "deferred tax" issue was decided against TWA. The 1965 determination in Order E–22022 that TWA was entitled to only $48,633,000 in transatlantic mail pay called for a $2,152,000 refund—a decline from the $8,153,000 refund ordered at the end of the offset phase, prior to the remand hearing.

### B. The "Transatlantic" Issues Involved in Determination of TWA's Need for Subsidy of Operations of International Division

Three of the issues raised by TWA affect the determination of the subsidy "need" of its international division.

#### 1. Disallowance of strike losses avoidable by prudent management.

TWA suffered a pilots' strike in 1946 and a navigators' strike in 1953. In the transatlantic phase the Board disallowed all the strike losses on grounds of general labor relations and rate-making policy. On the remand, and applying to TWA the principle of our *American Overseas Airlines* decision, the CAB considered whether these expenses met the "prudent management" test, that is, whether they were expenses that would have been incurred under "honest, economical, and efficient management" within Section 406(b).

The Board allowed in full the losses of the 1946 strike, two members dissenting. However, it disallowed ⅔ of TWA's $1,003,000 strike losses in 1953, when the navigators for transatlantic flights were out for 12 days, because it found that to this extent the prolongation of the strike could have been avoided by economical and efficient management.

---

4. Reopened Transatlantic Final Mail Rate Case, C.A.B. Dkt. No. 1706 et al. Order E–8672 (September 29, 1954).

■ We affirm the Board's ruling on this issue. Its conclusions flow rationally from its findings, and they in turn are supported by substantial evidence.

TWA leans primarily on the fact that TWA acted legally at all times, and the navigators acted illegally when their vain quest for job security in the face of displacement by equipment led them to strike in violation of their no-strike covenant. But the issue is not whether the company acted lawfully but whether it acted prudently—a higher standard. The contract and the Railway Labor Act, also invoked by TWA, may well have given TWA the right to spend its own funds without limit in implementation of the attitudes of management. But they do not give TWA a right to a subsidy to cover losses in a strike prolonged by its imprudent intransigence, and that is the critical finding before us.

The Board considered that the union's wildcat strike was illegal. But it noted (Tr. 16691):

> But good labor relations is not simply a matter of strict observance of and insistence upon legal and contractual rights and duties; it is a matter also of relations among human beings, and due account must be taken of ordinary human attitudes and emotions.

In short, as we see it, the Board was saying that wildcat strikes exist as facts of life, and that condemnation of their illegality does not necessarily define the task of prudent management, which is or should be affirmatively engaged in seeing how best to maintain a going concern. We see nothing arbitrary in this approach. The Board in no way assumed that prudence in taking account of human emotions required abject submission to labor demands. We note that the Board rejected the position (taken by two members) that the 1953 strike losses should be rejected entirely, even though the Board found that TWA contributed to the 1953 strike by failure to use all reasonable means to avert a work stoppage, specifically by failure to take the navigators into its confidence as to its plans for their future. Yet the Board also concluded that the "basic cause" of the strike was the navigators' "understandable but unjustified desire to keep their jobs indefinitely," and added that— "this TWA could not have conceded consistently with its obligation to avoid wasteful and unnecessary expense." In view of what it considered a "substantial possibility" that the strike, even if avoided in 1953, would have materialized at a later date, it rejected the contention that all 1953 strike losses should be disallowed.

■ In support of the disallowance of ⅔ of the 1953 strike losses, the Board stated in its critical finding.[5]

> Once the strike had begun, we agree entirely with the examiner that it was unnecessarily prolonged by TWA's intransigence. It is apparent from the testimony that within a very short time after their walkout, the navigators realized its futility; thereafter, their primary concern was to return to work under circumstances which would not leave those individual navigators who had responded to the strike call by refusing their flights to bear the whole brunt of the consequences of the union's collective action. ALNA's request for reinstatement of the discharged navigators was not an unreasonable one, even though the strike itself was illegal; TWA in fact acceded to this request in the ultimate settlement of the strike. As the examiner found, if TWA had not so long con-

5. The Board members were divided on the grounds for disallowance. Two voted for two-thirds disallowance on the ground that management's actions unduly prolonged the strike. Two members voted for total disallowance, stating that the strike itself could have been avoided by economical and efficient conduct on the part of TWA. They also concurred that the strike was unnecessarily prolonged due to TWA's conduct. Since the vote for two-thirds disallowance became the majority, only the prolonging ground need be supportable in order to validate the Board order.

tinued to insist on what amounted to unconditional surrender on the union's part, it could have achieved precisely the settlement it ultimately did at the cost of a substantially shorter strike.

The Board recognized that strike losses are a hazard management must face. The finding of TWA's intransigence is supported by TWA's rebuff of the efforts of federal mediators to bring the parties together, and its refusal for some time to talk with any union official, even officials of the parent union, which disapproved the wildcat strike and were trying to get the men back to work.

█ TWA charges that the Board was invading the sphere of management and was taking advantage of hindsight to hold management to an exceptional standard of conduct. We see no basis for concluding that the CAB ignored or disregarded the standards applicable to their tasks. It is plain that the Government officials determining subsidy "need" may disregard losses they determine reflected lack of prudent management, though equally plainly they may not disregard the losses merely on the ground that matters would have been handled differently if they had been managing the enterprise. American Overseas Airlines v. CAB, *supra*. In this respect the standard is not fundamentally different from that applicable in conventional utility rate regulation where the commission may disregard waste and improvidence but must not usurp the role of management. West Ohio Gas Co. v. Public Utilities Commission of Ohio (No. 1), 294 U.S. 63, 72, 55 S.Ct. 316, 79 L.Ed. 761 (1935). We seek to conjoin the spark of private profit and the drive of private enterprise

with some surveillance by Government officials devoted to the public interest. Lorain Journal Co. v. FCC, 122 U.S.App. D.C. 127, 133, 351 F.2d 824, 830 (1965), cert. denied sub nom. W.W.I.Z., Inc. v. FCC, 283 U.S. 967, 86 S.Ct. 1272, 16 L. Ed.2d 308 (1966).

█ That a conclusion of imprudence reflects a view of how business should be conducted is no reason for a court's withholding deference from permissible findings of the commissioners whose presumptively broad gauge warranted their appointment by the President, with the advice and consent of the Senate, to undertake the delicate task of surveillance of the regulated industry. *Cf.* Oil, Chemical & Atomic Workers (Allied Chemical) v. NLRB, 124 U.S.App. D.C. 113, 362 F.2d 943 (1966). The Board determined that the evidence affirmatively showed petitioner's inefficiency and imprudent management.[6] We see no basis for concluding that it exceeded appropriate limitations on its role.

We are not unaware that the difficulties may be greater in practice than in philosophy in avoiding an improper usurpation of managerial discretion while conducting a proper review of abuse of that discretion, and that these difficulties are not lessened when Government officials have the 20-20 vision of hindsight. The greater risk of disallowances is doubtless noticeable even in conventional rate-making when the period under consideration is past and the commission proceeds by reference to actual operating figures rather than *nunc pro tunc* estimates.[7]

The other side of the coin is that in some instances utilities may gain the

---

6. In view of the record as we find it we have no occasion to consider the contention of appellee's counsel (Br. 51) that applicants for subsidy may have a "burden of proof" greater than that normally assigned to utilities seeking an opportunity to charge rates to consumers. Possibly in deference to what are at least dicta in American Overseas Airlines v. CAB, *supra*, the Board made affirmative findings of imprudent management in connection with this and other disallowances.

7. *See* West Ohio Gas Co. v. Public Util. Comm. (No. 2), 294 U.S. 79, 82, 55 S.Ct. 324, 79 L.Ed. 773 (1935); Justice Jackson, dissenting, in Transcontinental & W. Air, Inc. v. CAB, 336 U.S. 601, 610, 69 S.Ct. 756, 93 L.Ed. 911 (1949); Summerfield v. CAB, 92 U.S.App.D.C. 248, 253, 207 F.2d 200, 204–205, aff'd, Western Air Lines Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1953). *Cf.* Zenith Radio Corp. v. FCC, 93 U.S.App.D.C. 284, 289, 211 F.2d 629, 634–635 (1954).

benefit of pointing to an adverse change in conditions more readily sensed by management than Government officials. And in case of Section 406 "need" the carrier obtains recognition for extraordinary losses that could never have been made available in a prospective projection. That consideration is indeed paramount in regard to strike losses, as *American Overseas Airlines* makes clear, and has netted petitioner an increase of several millions in the Board's recomputation of its Section 406 rates.

■ We see no basis for concluding either that the Board applied an erroneous criterion, or that it was arbitrary or capricious either in the findings or extent of disallowance of 1953 strike losses.

### 2. Disallowance of excessive selling expenses.

■ The Board disallowed $1,784,000 of TWA's selling expense for 1951–53 as in excess of the amount appropriate under the "honest, economical and efficient management" criterion of Section 406(b)(3). TWA contends the disallowance was an unwarranted interference with TWA's managerial discretion. The issues of principle are broadly the same as those discussed in connection with strike losses. In addition there is Supreme Court precedent upholding the authority of a rate regulatory agency to make a determination that certain selling expenses are extravagant and to that extent not recoverable in rates paid by consumers of a public service, and deferring to agency discretion in exercise of that authority when supported by substantial evidence. Acker v. United States, 298 U.S. 426, 431, 56 S.Ct. 824, 80 L.Ed. 1257 (1936). This authority of the agency is no way negatived by the principle that good faith is presumed on the part of the managers of a business regulated by the Government, and that—in the absence of a showing of inefficiency or improvidence— their judgment on prudent outlay is not to be set aside by a commission regulating rates. West Ohio Gas Co. v. Public Utilities Commission of Ohio (No. 1), 294

U.S. 63, 72, 55 S.Ct. 316, 79 L.Ed. 761 (1935).

■ An agency's action disallowing expenses is entitled to an even greater deference in the context of a subsidy proceeding. An applicant for subsidy can be called on to adduce ample substantiating proof that its expenditures are reasonable, though it is not clear whether this marks a substantial difference from the case of a utility which may also be assigned the burden of coming forward with information and reports reasonably requested by the commission regulating rates. More significantly, a subsidy agency may realistically stress diligence to avoid excessive advertising and selling expense since restraints that normally operate on corporate management may be subdued in the case of a subsidized operation, where the managers may be influenced by the possibility if not the prospect that current subsidized advertising expenditures would attract customers who would remain, in good measure, as patrons in the later subsidy-free period. The danger of spiraling selling costs is manifest where subsidies are payable to carriers who compete with each other.

Once the principle of setting a ceiling on selling expenses is established, it seems plain that the Board acted reasonably and that its action has support in the record. The examiner concluded, and the Board agreed, that 19.5% of commercial revenues was an appropriate upper limit for selling expense of transatlantic carriers generally. It was stressed that density of transatlantic carriers, when measured by revenue ton-miles per station, was comparable to the domestic Big Four, and concluded that the 19.5% figure, about 50% above the Big Four level, gave latitude of action to the management of the transatlantic carriers.

■ In this respect and in others, TWA attacks the comparisons used in arriving at the 19.5% limit. TWA errs when it supposes that comparisons can only be made when items are similar.

Such a thesis would in effect bar comparative analyses in appraising efficient management, since there are always some differences, and even significant differences, between and among carriers, routes and traffics. It is indeed a platitude of the decisions on rate regulation that to a significant degree each case stands on its own footing.[8] It is within an agency's discretion, however, to make comparisons by providing adjustments for the areas of difference.[9] Here the Board made allowances for the differences between transatlantic carriers and the domestic operations of the Big Four; it allowed for the lesser degree of transatlantic competition prior to 1949 by fixing a ratio higher than average experience in those years; it took account of the distortions of the Korean period by allowing a higher ratio than then prevailed.

■ Considerable judgment pervaded the making of these comparisons and the quantification of the adjustments. TWA's observations as to the imperfections of the Board's comparisons are not without some logic, but they have more of an aura of theory and perfectionism than of pragmatism. Rate-making and subsidy administration, comparable in many aspects to rate regulation, is an intensely practical affair. "Elaborate calculations which are at war with realities are of no avail."[10] It would be a mischievous rule at war with the requirements for a practical administrative surveillance of expenses to vitiate comparisons with and adjustments from known

data because of large gaps in the data. The perfect must not be the enemy of the good. The art of government may involve the science of statistics, but it is a subtler and more complex calling in the ultimate determinations required. An agency's decision cannot rest significantly on a judgment pulled solely out of the air, without an anchor in the record.[11] In appraisal of a record, however, generous dollops of judgment are proper and perhaps necessary. As for criticisms of formulae and approaches used by regulatory officials, Justice Brandeis' observation bears repetition—that "experience teaches us that it is much easier to reject formulas presented as being misleading than to find one apparently adequate."[12] A lint-picking critique will not serve to undermine a regulatory surveillance that has the hallmark of a conscientious effort merely because it cannot and does not purport to attain anything like the refinement of a mathematical discipline.

■ The Board made some allowance for all the differences shown in the record between the experiences of TWA and of the other situations noted by the Board. We see no basis for saying its adjustments were arbitrary or insufficient as a matter of law.

Because TWA faced unusual competition in the form of Pan-American's luxury seating configuration of its B-377's, the Board allowed TWA an extra 1.5% in selling expense ratio above the industry ceiling, thus permitting TWA a 21% ratio. This was based on the amount by

8. *See, e.g.,* Driscoll v. Edison Light & Power Co., 307 U.S. 104, 119, 59 S.Ct. 715, 83 L.Ed. 1134 (1939); Bluefield Water Works & Improvement Co. v. Public Serv. Comm., 262 U.S. 679, 692, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); Willcox v. Consolidated Gas Co., 212 U.S. 19, 48, 29 S.Ct. 192, 53 L.Ed. 382 (1909).

9. Leventhal, *Vitality of the Comparable Earnings Standard for Regulation of Utilities in a Growth Economy,* 74 YALE L.J. 989, 1010 *et seq.* (1965).

10. Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 164, 54 S.Ct. 658, 663, 78 L.Ed. 1182 (1934).

11. City of Detroit v. FPC, 97 U.S.App. D.C. 260, 230 F.2d 810 (1955), cert. denied, Panhandle Eastern Pipe Line Co. v. City of Detroit, Mich., 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956).

12. Groesbeck v. Duluth, S. Shore & Atl. R. Co., 250 U.S. 607, 614–615, 40 S.Ct. 38, 41, 63 L.Ed. 1167 (1919); *see* American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

which TWA's expenses increased following Pan-American's introduction of the luxury craft. That constitutes adequate record support.[13]

■ Finally, TWA says that the Board used an "arid formula" because in fact TWA's high selling expenses are what enabled it to go off subsidy. There is no evidence of record to establish a cause-effect relationship. There is a speculative possibility that TWA may be right, but this does not permit us to say that the Board acted arbitrarily.

■ TWA charges that this places on the carrier a burden of proof on this point that is onerous to the point of the impossible. Perhaps so, but this is only to say that when the evidence of record does not fairly establish either a proposition or its contrary, the agency is within its sound discretion in adhering to what is knowable and avoiding what is necessarily in the domain of speculation.

■ TWA's general charges of interference with managerial discretion, already answered in general terms in the discussion of strike losses, may indeed have a nub of proper concern that managerial enterprise may be stifled by the prospect of surveillance. In our *Lorain Journal* [14] opinion, we suggested that the retention of the drive of private enterprise and spark of private profit could be best achieved with a loose rein of Government surveillance. "We do not welcome a gigantic bureaucracy second-guessing corporate management on details." [15] The surveillance approved by Congress involves judgment and discretion. In an increasingly complex society we accept if we do not welcome the reality that surveillance and review inevitably mean some restraint. Assuming that Governmental surveillance is a brooding omnipresence beclouding the sky of corporate management with confining consequences, that is an accepted and acceptable accompaniment to such privileges as freedom from unrestricted competition. Certainly a company that seeks and pockets the boon of subsidy or protective contracts cannot assail the restraint inherent in accountability to Government officials as a tyrannical burden. The Government officials are themselves accountable in court for compliance with the Rule of Law applicable to administrative agencies. As already pointed out we cannot see that the petitioner has established the agency's action in this case to be arbitrary or capricious.

### 3. Disallowance of "termination indemnity" accruals.

The "termination indemnity" issue is relatively small in amount, about $350,000, but large in significance, for its proper disposition requires attentive consideration to fundamentals.

TWA operates in foreign countries, like Italy, where laws require employers to pay "termination indemnities," in effect severance pay, based on past wages and years of service, to employees who die, retire, or are discharged other than for cause. Unlike our social security system those laws do not provide any current funding of the future liability, by payment to the Government or anyone else. The termination indemnities actually paid out by TWA during 1946–53 have been allowed for subsidy purposes without question. Beginning in 1950,

13. This 1.5 per cent adjustment was higher than that proposed by the Staff. The examiner would have allowed TWA's full selling expense from 1950, since this was less than Pan American's increased operating costs, but the Board found no direct relationship between those costs and the extent of superior attractiveness of the Pan American craft.

14. Lorain Journal Co. v. FCC, 122 U.S. App.D.C. 127, 351 F.2d 824 (1965), cert. denied sub nom. W.W.I.Z., Inc. v. FCC, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966).

15. Id. at 133, 351 F.2d at 830.
 What is classified as a restraint on details may in some instances operate to enlarge rather than constrict genuine freedom to deal with the affairs that are vital. *See* Leventhal, *Pillars of American Democracy: Our Armed Forces and Reverence for the Law*, JUDGE ADVOCATE J. 30, at 33 (Bull. 39, June 1967).

TWA began accruing on its books a reserve for future termination payments, and it seeks recognition of this reserve as a current operating expense. The examiner upheld TWA's position on the ground that its accruals represented sound accounting practice, and were based on sufficient experience to allow reasonably accurate prediction of the amounts ultimately payable. The Board reversed, holding that the issue was not whether these accruals represented good accounting practice, but whether they represented "need" for subsidy during the period in issue. The Board agreed with its staff, that these accruals represented sums which had not yet been paid out, might never be entirely paid out, or might be paid out only at a time when TWA would be self-sufficient, and would have no "need" for subsidy reimbursement.

 Affirmance on this point is required by the doctrine that compels deference to administrative construction of a statute unless it is arbitrary or contrary to an ascertainable legislative will.[16] The question is the meaning of the statutory term "need" in the context of the air transport developmental subsidy. Interpretation of a subsidy statute does not necessarily follow the approach of general accounting principles, which are primarily an aid in enhancing perspective and informed judgment of management. Management accounting assumes a continuing enterprise in which one year is not distinctly different from another, and there is a major objective in being cautious against overstatement of current income lest inattention to or non-disclosure of an economic liability result in the unavailability of funds required for a bill that will be presented in the future. It may likewise be assumed, although we have not been cited to a precedent on all fours, that in view of principles generally applied in the administration of federal income tax laws, these reserves would be held proper accruals for the purpose of establishing deductions from income. However, treatment for purposes of tax status—which assumes indefinite continuation of the system of taxing income—is not necessarily decisive of proper treatment under a subsidy program.[17] For purpose of the subsidy program the Board looked at the future not as an indefinite stretch of years of generally similar administration, but rather as a relatively short-range subvention period of protection for companies and an industry in its development stage, followed by a long-range condition of self-sufficiency. We cannot say the Board erred in the interpretations giving a decidedly short-run emphasis to the subsidy program for the development period until the carrier is able to do without subsidy and join other regulated but unsubsidized transportation enterprises. The Board considered that the "need" of the carrier is a need to survive through the development period, and not a "need" to attain self-sufficiency with the same kind of accrual reserves that a conservative management might have tucked away in capital accounts during prosperous years. The Board has in effect construed the basic purpose of the "need" criterion as the coverage of current cash requirements with modest and limited exceptions. That does not mean the carrier is simply put on a cash basis, for even if a carrier pays cash for a new plane it will recapture its costs for subsidy purpose through depreciation accruals. But the Board's approach has been hostile to payments out of subsidy dollars before the carrier has been called upon for cash payments. The Board has been extremely chary in making subsidy allowance for expenses

16. Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L.Ed.2d 616 (1965); Grain Elevator Workers v. NLRB, 126 U.S.App. D.C. 219, 376 F.2d 774, 781 (1967).

17. FPC v. United Gas Pipe Line Co., 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18

(1967); City of Chicago v. FPC, 128 U.S. App.D.C. ——, 385 F.2d 629 (No. 19604, September 8, 1967); Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d 318 (5th Cir.), cert. denied 385 U.S. 802, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966).

not actually paid out prior to or during the review period. Where such allowance has been made, the expenses almost invariably have been those which (a) could be predicted with a high degree of certainty, (b) were directly related to the operations of the review period, and (c) were payable within a short time after the close of the review period or the issuance of the Board's order. We cannot say that there is anything arbitrary in this approach, or in its application to deny the accrual of the reserves in question, which may not result in substantial payments for many years and may never be wholly paid out.

 Administration of subsidy laws may not only be governed by concepts that are different from the common coin of corporate controllers and tax gatherers, but also by an approach that differs from conventional rate regulatory doctrine. There are at least some instances where an agency regulating maximum rates appropriately makes an allowance for current expenses in the form of accruals of liabilities related to current operations though payable at a later date.[18] We do not say one way or the other whether a regulatory commission regulating maximum rates could reasonably fail to provide some allowance for accrual of termination indemnity reserves. But even if it be assumed that it would be more appropriate that this burden should fall on the ratepayers of today than the ratepayers of tomorrow, that does not impel the conclusion that it is a burden to be borne by taxpayers (of today) rather than consumers (of tomorrow).

 In some respects the "need" subsidy for air carriers has been patterned on utility rate regulation concepts. Transcontinental & Western Air, Inc. v. CAB, 336 U.S. 601, 605, 69 S.Ct. 756, 93 L.Ed. 911 (1949). Yet there are also significant differences. *See* Summer-

field v. CAB, 92 U.S.App.D.C. 248, 253, 207 F.2d 200, 204 (1953), aff'd sub nom. Western Air Lines, Inc. v. CAB, 347 U. S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1954). "[The] disputed basic consideration is a need, a need beyond the requirements of fair compensation for a service performed, not dependent upon the amount or the nature of the service rendered." *Id.*

 That expense allowances need not be the same for subsidy as for rate regulation purposes is clear from American Overseas Airlines v. CAB,[19] discussed above. That decision operated to the advantage of petitioner because it held strike losses compensable within subsidy "need" even though the court was expressly aware that a commission regulating rates would not normally deem it proper to give consideration to that problem. Termination indemnities may be an issue where the conventional regulated utility fares better than the subventee. The key point is that rate regulation and subsidy administration lay the burdens on different classes, and different considerations are involved in the allocation of burdens. But it seems appropriate to interject that what we think is implicit in the Board's exclusion of this expense allowance is now made explicit by our affirmance of that ruling. If the making of such termination indemnity payments in the future comes in issue before the Board at another time (say if TWA should have to go back on subsidy in the future), or probably even in another context (conceivably in a regulatory proceeding if the Board is ever given the authority to regulate air rates in foreign commerce), the Board could not properly question the future timing of disbursements on the ground that they should have been reserved or funded during the period when subsidy payments were available.

18. *See* City of Chicago v. FPC, *supra* note 17 (385 F.2d p. 633).

19. 103 U.S.App.D.C. 41, 47, 254 F.2d 744, 750 (1958). *See also* Delta Air Lines,

Inc. v. CAB, 108 U.S.App.D.C. 88, 92, 280 F.2d 636, 640 (1960), distinguishing between the finality principles governing an ordinary utility rate proceeding and a subsidy proceeding.

### C. The "Offset Issues" Arising in Determination of Reduction of TWA's "Need" for International Subsidy by Reason of Excess Domestic Earnings

The Board's final order for refund of $2,152,000 reflected its determination in the "offset phase" of the proceeding, reducing TWA's computed international need by an "offset" of $2,859,000 determined to be its domestic "excess earnings," inclusive of tax effect, for the period February 5, 1946–December 31, 1953,[20] TWA's international "open rate" period.

#### 4. The "screening" of excessive domestic expenses.

The Board disallowed $1,492,000 of TWA's reported domestic expenditures which it held did not qualify under the Section 406 standard of "honest, economical and efficient management." The disallowances are not contested as to validity of amount if screening is permissible.

TWA agrees that its reported earnings can be "screened" in the sense of making accounting adjustments. But it objects, for example, that the Board does not now have power to say that its expenses for 1946[21]—which represent the bulk of disallowances ($1,116,000)—were too high. TWA says that the Board already determined TWA's need under proper management in 1945, when it fixed a group service rate of 45 cents per ton mile for mail, and in 1951 when it reaffirmed that service rate for the period subsequent to 1950. And it relies on the Supreme Court's ruling that final subsidy determinations cannot be redetermined retrospectively, see Transcontinental &

Western Air, Inc. v. CAB, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949).

We find no error. We note first that the Board did not determine any excess for the 1947–1950 period where it had finally determined need for the subsidy required to meet domestic "need" under prudent management (see note 20). As to the "open" domestic periods, the decisions fixing TWA's domestic mail rates were service rates, not subsidy determinations.[22] They were based on a group cost of carrying the mail, and were not a determination as to TWA's passenger and general domestic operations from the viewpoint of 406 standards. Transcontinental & Western Air, Inc. v. CAB holds that a final rate cannot be retroactively reopened. It has no bearing on what may be considered in an avowedly open proceeding. On that the Supreme Court's 1954 decision in Delta Air Lines v. Summerfield, supra, is conclusive in that it says that the Act forbids a subsidy that exceeds the "need" of the carrier as an entity in the light of its entire operations. We think the Board was correct in saying: "The only 'need' which Section 406 of the Act permits us to recognize is that incurred under 'honest, economical, and efficient' management. Plainly we cannot assay the honesty, economy or efficiency of the carrier's operations by mere scrutiny of results as reported by the carrier in its Form 41 reports."

TWA picks up language here and there from Delta, and its companion case, Western Air Lines, Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1954), and argues, e.g., from Supreme Court references to restaurant income and car-

---

20. The Board did not compute any "excess" for the period from March 14, 1947, through December 31, 1950, on the ground that the "Big Four" case, American Airlines, Inc., Mail Rates, 14 C.A.B. 558 (1951), had already determined TWA's domestic "need" for this period retrospectively and had fixed a subsidy rate it found would meet that "need" under prudent management. This ruling has not been appealed.

21. TWA was undoubtedly confronted with a difficult assignment in seeking to justify 1946 expenditures, and counsel note that the 1946 records are no longer available. But no contention has been made or preserved on limited grounds, e.g., of unfairness in determining amount. The case is put to us on a broad request to interdict all retrospective "screening."

22. Transcontinental & W. Air, Inc. Mail Rates, 6 C.A.B. 595 (1945).

riers with lush treasuries, that the Supreme Court is referring to actual revenues received, and not excessive expenses disallowed, or retroactive determinations. These references must be read in the light of the manifest objective of the opinions to avoid a burden on taxpayers except for a carrier showing overall need under standards of efficient management. TWA's theory would mean that the taxpayers were saddled with the cost of any expenditures that the carrier made, however improvident, and we conclude this was not the intent of *Delta*.

### 5. The domestic rate of return.

The Board determined that an 8 per cent return on investment would satisfy the "need" of TWA's domestic division under Section 406(b) (3), and reduced TWA's international "need" by the $2,859,000 that the earnings of the domestic division, enhanced to reflect the screening already discussed, exceeded that 8 per cent figure.

TWA does not challenge the Board's determination in the main transatlantic case, on a record that included a detailed "cost of capital" study, that the three carriers should be allowed a return of 7 per cent for the past period 1946–1953 (and 9 per cent for the future period beginning January 1, 1954). The Board's 8 per cent domestic rate decision was based on the record in the transatlantic phase as well as in the offset phase, which was not materially different. The Board pointed out that the 8 per cent figure was the return figure used by the Board in the past when it fixed TWA's contemporary service mail rates and was the figure customarily used in constructing future-period subsidy rates for other carriers.

The Board took note of evidence that TWA's stock was relatively attractive in its category (albeit somewhat more "speculative" than other stocks of the Big Four), and of its pioneering in introducing modern equipment and lower fares, and concluded from the record that TWA's ability to obtain financing was established and in any event not effectively contradicted. It is clear that the Board has the power to determine the domestic rate of return "needed" by the carrier, and even to make a redetermination of rate of return if not precluded by a decision underlying a final order. Delta Air Lines v. CAB, 108 U.S. App.D.C. 88, 280 F.2d 636 (1960), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L. Ed.2d 94 (1960) (sometimes referred to as "*Delta* Reopened"). There can be no serious doubt that the cost of capital study provides substantial evidence supporting the 8 per cent determination.

There are a number of strands to TWA's contention on rate of return, but it has identified its main point as a protest that the Board improperly fixed TWA's domestic rate of return much lower than that allowed TWA's stronger domestic competitors. TWA stresses that the reported earnings of American, Eastern and United for the years 1946 and 1951–1953 were 12.03 per cent on investment.

Interwoven are assertions that although TWA's domestic division was during this period on a non-subsidized or "service" rate basis, the Board has indulged the fiction in its retrospective determination that TWA was to be regarded as "subsidized." TWA further charges that the Board has uniformly allowed service rate carriers at least 10 per cent on investment, and specifically notes that when the "Big Four" service rate was set in 1945, the Board stated that an overall return of 13.77 per cent on domestic operations predicted for TWA would be a fair and reasonable return.[23] Even higher returns were predicted for the other carriers in the Big Four.[24] And TWA reiterates that these high rates of return were not only predicted, but were permitted to be earned, and the Board

23. *Supra* note 22.

24. American Airlines, Inc., Mail Rates, 6 C.A.B. 567, 574 (1945); United Air Lines, Inc., Mail Rates, 6 C.A.B. 581, 588 (1945); Eastern Air Lines, Inc., Mail Rates, 6 C.A.B. 551, 558 (1945).

made no effort to attack as excessive these high earnings reported to it. Finally, TWA notes that in 1953 the Board dismissed its investigation of passenger fares without a reduction notwithstanding the finding that the industry had earned 12 to 15 per cent in 1950–1952. General Passenger-Fare Investigation, 17 C.A.B. 230 (1953). And in 1960, after another investigation, the Board found a fair and reasonable rate of return to be 10.5 per cent for trunkline carriers generally, and 10.25 per cent for the Big Four. General Passenger-Fare Investigation, 32 C.A.B. 291 (1960).

TWA's counsel have cast a wide net. One way to approach the problem would be to review the Board's rate dispositions over the past decades and consider what inferences may fairly be drawn from the decisions, and whether anything like a case of discrimination can be made out. Such a process would generate an array of rebuttals of TWA's charges. We note, for example, that in the 1953 *Passenger-Fare* case, *supra,* the Board explicitly characterized the industry's recent earnings as excessive, but refrained from reducing fares only on the theory that the carriers would be expected to subsist without subsidy when poor earnings were subsequently encountered. In effect they were to be the fat years of Joseph's dream. Not only does the 1960 *Passenger-Fare* case relate to a later period than the one before us, but the Board described the 10.5 per cent rate of return there found appropriate as "at the upper limits of the range of reasonableness." 32 C.A.B. at 305. The Board pointed out that a margin had to be allowed in industry-wide rate setting over that appropriate for a rate determination for a particular company. As for the statements in TWA's service mail rate case in 1945, even treating the Board's prediction of a 13.77 per cent return as a dictum that this would not be an excessive rate

of return for the risks of general domestic business, it was not a determination that this was the rate of return that marked the threshold of "need". The mail rate was set on an 8 per cent rate of return (on investment related to mail), and the most that can be said about the dictum is that it was indulgent to "high reasonable" returns on fares paid by the public.

Perhaps the better way to cope with TWA's broad strokes is to refer to a number of general doctrines that attenuate its precedents and undercut its contention. We begin by noting that the concept of reasonable return is that of a zone and not a point or single line.[25] Furthermore, an agency's inaction in the face of upper-reasonable or even avowedly excessive fares or rates builds up no vested rights for others in the industry to insist on continuance of ineffectiveness of regulation. There are various reasons, no less powerful because they are in large part procedural, why a commission may be realistically aware that it will have difficulty in establishing a rate to be unreasonably high and ordering its reduction even though it might be able to resist an application for increase from the lower rate in a proceeding where the utility must shoulder the burden of showing the lower rate is unreasonably low and must be increased.[26] Rigor is a particularly appropriate watch word when regulatory agencies superintend payments from the public fisc. The insistence of the companion *Delta* and *Western* decisions that there be a meaningful showing of "need" of the company as a whole, without blinders shutting off the view of lush profits in incidental areas, cannot be circumvented by insisting that these verdant pastures are also used by other fat cattle.

Turning to more specific aspects of the case, we conclude that the Board has taken into account and made allowance

25. Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951); *see also* Hale, Commissions, Rates, and Policies, 53 Harv.L.Rev. 1103, 1115 (1940).

26. *See, e.g.,* Atlantic Ref. Co. v. Public Serv. Comm. ("CATCO case"), 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

for the risks attending TWA's domestic operations. The cost of capital study of the Big Four is essentially an appraisal by investors of the risks of domestic operations that are unsubsidized. The Board gave TWA the benefit of the 8 per cent return customarily used in prospective subsidy determinations, a rate which takes account of contingencies, rather than the 7 per cent customarily used by the Board in calculating subsidies payable for past operations. The 8 per cent figure was not reduced even when the Board enhanced cash retention by adding strike losses to operating break-even costs.

█ Other points have been discussed by counsel. Essentially, as we see it, TWA's outcry is an assertion of unfairness of siphoning off part of its domestic earnings to meet its international need at a time when its principal domestic competitors were not subject to such treatment. This identical argument was decisively rejected in *Delta* as a policy consideration properly addressed to Congress, but otherwise unavailing against the statutory limitation of subsidy to the overall "need" of the individual carrier.

6. **Use of "remaining life" method for adjustment in residual values of planes and engines.**

In 1953 the Board ruled the recognized "residual value" of TWA's aircraft and engines for depreciation purposes must be adjusted upward from various lower values previously approved to a uniform 15 per cent of original cost. TWA does not challenge the Board's authority to order this change, or the 15 per cent figure. The dispute is as to the method used to reflect the corresponding decrease in the total amount of allowable depreciation over the equipment's useful life. The Board used the "remaining life" method, wherein no change is made in the depreciation charges and book values

already recorded on the books, but instead the adjusted residual value is subtracted from the asset's depreciated book value on the date the adjustment takes effect, and the new depreciable balance is then spread evenly over the then remaining useful life of the asset. In the offset proceeding, TWA insisted on use of the "full life" method whereby all previous depreciation charges to date of acquisition are set aside and calculated anew so as to spread evenly over the full service life of the asset the reduction in depreciation charges.

The Board's use of the "remaining life" method resulted in TWA's having $467,000 less in total depreciation during the review period (and accordingly $467,000 more in excess earnings) than if the "full life" method had been used. The difference is due to the fact that there was a "closed period" in 1947–1950 (see note 20), so that if the full life method had been used, the "excess" depreciation amounts taken in 1947–1950 could not have been recalculated for purposes of determining total excess earnings.

█ We conclude that the Board did not act improperly in using the remaining life method. There is no evidence that the Board was acting contrary to any general policy, solely in order to decrease TWA's subsidy payment. On the contrary, the Board has stated in its brief, without contradiction by TWA, that it is the Board's uniform practice to use the remaining life method in subsidy cases. (Board Brief, p. 35.) The use of the remaining life method in subsidy cases has been held by this court to be within the range of Board discretion. Northwest Airlines, Inc. v. CAB, 119 U.S.App.D.C. 264, 266 n. 4, 340 F.2d 789, 791 (1964).[27]

██ The precedent is both recent and sound. The focus of 406 need, as already noted, is to supply the year by year

27. TWA contends that *Northwest* does not govern because there was no "closed period." That does not undercut the Board's authority to maintain its general accounting approach. Furthermore, what amounted to a closed period was present in *Northwest* because of the fact that the case dealt only with the subsidy pay for the year 1954. The years prior to 1954 were, for purposes of the litigation, closed.

cash requirements for out-of-pocket expenses. It is a long established Board position that capital expenditures are not included within this out-of-pocket focus.[28] What is covered by 406 need is the cost of retirement of the equipment (original cost minus residual value).

■ The only requirement is to use a reasonable means of providing the carrier with the cost of retirement by the end of the equipment's useful life. This requirement is met by the remaining life method. Section 406 demands no more.

■ The Supreme Court's decision in the *New York Telephone Company* case [29] is no bar. That case was concerned with a correction of greater inherent impact, undertaken by the state commission in a radical attempt to overtake the improprieties of the company's past action—not as here a revision of charges permissible when accrued. We need not determine whether that decision would be applicable to rate-making in the light of other precedents clarifying the latitude of administrative discretion in selection of accounting techniques. American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936). Certainly there is latitude under general subsidy doctrine to calculate need in accordance with reasonable and accepted formulae. TWA is in effect trying to insist on a particular accounting method because in its particular circumstances of a "closed period" the Board would be unable to recoup the past payments for a need TWA admits would never have been claimed if the parties could have visualized the higher residual values that later materialized in fact. There may be cases where a company's "good luck" leads to that kind of result, just as its bad luck may lead to the contrary. But we certainly cannot say that either precedent or principle mandates a declaration of the impermissibility of a standard accounting

method in calculating subsidy payments. The Board left untouched TWA's own charges, calculated in the light of the facts available at the time, and made the accounting revisions later seen to be required, in the light of re-evaluation of the facts, available on a prospective basis. TWA has no just cause for complaint.

### 7. Disallowance of accelerated amortization tax reserves.

■ During 1951–1953, TWA purchased certain flight equipment and ground facilities for use in its domestic operations which qualified as "emergency facilities" under what is now Section 168 of the Internal Revenue Code of 1954. Section 168 allows any taxpayer who invests in a new productive asset qualifying as an "emergency facility" to amortize its cost for tax purposes over a period of five years instead of over the asset's longer useful life. TWA elected to take the "accelerated amortization" on its qualifying purchases, with the result that its actual tax payments for 1951–1953 were approximately $3,110,000 less than if it had used ordinary straight-line depreciation. TWA accrued $2,990,000 into a book reserve as "deferred taxes" on the theory that the reduced amount would have to be paid in later years, after the assets were fully amortized. The Board ruled that this reserve did not qualify as a current expense to be covered by 406 subsidy payments. We affirm the Board's disposition.

■■ The basic question here is whether the benefit of lower taxes during 1951–1953 should operate so as to reduce the amount of subsidy. Tax statutes are not decisive as to the administration of other Government programs. FPC v. United Gas Pipe Line Co., 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967). The Congressional expression of purpose must, however, be taken into account by the agency involved. Here it was taken

---

**28.** American Airlines, Inc., Mail Rate Proceeding, 3 C.A.B. 323, 333 (1942); Capital Gains Proceeding, 27 C.A.B. 79, 82–86 (1958).

**29.** Board of Pub. Util. Comm'rs v. New York Tel. Co., 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926).

into account and was considered not to require a change in the Board's subsidy policy disallowing such tax deferrals over and above "actual tax" obligations for purposes of subsidy computation.

 TWA naturally relies on our 1955 *City of Detroit* opinion.[30] The court there upheld an FPC order allowing the public utility company to establish a tax reserve, and thus to charge the same commercial rate to which it would have been entitled if it had gotten no tax benefit. In a rate-making proceeding the Board quoted from *City of Detroit* and approved the carriers' use of "normalized taxes" in calculation of costs. General Passenger-Fare Investigation, 32 C.A.B. 291, 326 (1960). But there is a distinction to be drawn between agency rulings and court decisions in the context of rate-making, under statutes providing for determination of rates that are "reasonable," and the rule applicable to dispensation of subsidy under Section 406(b) (3), which has been interpreted strictly by the Board and courts to insist on limitation of payment to current "need." These are patently overlapping concepts, but subsidy principles bar some of the rulings, discretions and policies that are permissible in commercial rate-making.[31]

In conventional rate cases the regulatory agency stands as an arbiter between the interests of the regulated utility and those of its customers.[32] In dealing with tax reserve problems the question is whether tax benefits provided by the tax laws shall inure to the advantage of the utility or its customers, or both. *City of Detroit* held the FPC was authorized to confine them to the utility. In our en

banc *Panhandle Eastern* opinion in 1963,[33] we discussed the liberalized depreciation benefits of Section 167 of the Code and held the FPC was authorized to divide the benefits between the utility and the consumers. In our recent *City of Chicago*[34] opinion we approved the FPC's determination to require a flow through to current consumers of the tax benefits currently obtained by the utility. We noted in that opinion that current accrual items may be of such a nature as to warrant a regulatory commission's taking into account the consideration that disallowance of the current accrual in effect puts the burden on future consumers and requires them to "subsidize" the ratepayers of today.

 The considerations are substantially different in subsidy cases. The Board is not arbitrating between private economic interests but rather has a primary duty to the taxpayers, to pay out no more in subsidy than is currently needed to accomplish the purposes of Section 406. If part of the burdens that an unsubsidized company might shoulder today can be so disposed as to come to rest on the applicant for subsidy, after it becomes self-sufficient, rather than on today's taxpayers, that is entirely in accordance with the contemplation of the statute. Even assuming that if the burden is borne by consumers it is more reasonably shouldered by the consumers of today than of tomorrow, this does not mean that it should be sustained solely by the taxpayers paying the subsidy and not at all by consumers.

These subsidy considerations are underscored where as here there are doubts and contingencies as to whether, when

---

30. City of Detroit v. FPC, 97 U.S.App. D.C. 260, 230 F.2d 810 (1955), cert. denied sub nom. Panhandle E. Pipe Line Co. v. City of Detroit, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956).

31. See *supra*, p. 662 F.2d, and the discussion of the *Delta, Western* and *American Overseas Airlines* cases.

32. Justice Holmes has characterized regulation as a fair bargain, steering a middle course between confiscation and untram-

meled extortion by monopoly power. Cedar Rapids Gas Light Co. v. City of Cedar Rapids, 223 U.S. 655, 669–670, 32 S.Ct. 389, 56 L.Ed. 594 (1912).

33. Panhandle E. Pipe Line Co. v. FPC, 115 U.S.App.D.C. 8, 316 F.2d 659 (en banc), cert. denied, 375 U.S. 881, 84 S.Ct. 147, 11 L.Ed.2d 111 (1963).

34. City of Chicago v. FPC, 128 U.S.App. D.C. ——, 385 F.2d 629 (No. 19604, September 8, 1967).

and to what extent the company will actually sustain the future tax burden. Here, for example, TWA should have begun payments in 1956 of the tax burdens it is said to have deferred in tax reserves on purchase of assets in 1951. However TWA had no tax obligation for 1956, 1957 or 1958, and its tax payments for 1959 and 1960 were subsequently wiped out by virtue of loss carrybacks from 1961 and 1962. At the time of the Board's decision TWA had not yet paid the Government a single dollar of the anticipated tax increases that were to have offset its $3 millions of tax reductions in 1951–1953. The contingencies in the situation also relate to the tax rate effective at the time the tax, if any, becomes actually payable, for there have been tax rate reductions (and increases) since 1951.

■■■ In subsidy cases the Board has adhered consistently to the "actual tax" policy it adopted in Western Airlines, Inc. and Inland Air Lines, Inc., Mail Rates, 14 C.A.B. 201, 251–55 (1951). On appeal this court affirmed, saying, see Summerfield v. CAB, 92 U.S.App. D.C. 248, 254, 207 F.2d 200, 206 (1953), aff'd sub nom. Western Air Lines, Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L. Ed. 508 (1954):

> The [carrier's] tax liability upon an estimated basis as of the beginning of the period was some $600,000. It developed that, due to carry-back losses and other provisions of the federal tax statutes, Western had little or no tax liability for this period. In its final orders on mail pay the Board acted upon the latter basis of fact. We think it was correct in doing so.[35]

We conclude that so far as subsidy administration is concerned the "actual tax" policy is correct as a general principle, and no considerations of fairness require enhancement of "actual tax" to include the accrual of the tax reserves under discussion.

TWA relies on an implied Congressional intention in the enactment of the taxing law. That law did provide an incentive to make an acquisition of assets considered to be in the interest of national defense policy. But there is nothing to show that Congress intended to pile this Ossa of inducement on top of the Pelion of the incentive in the 406 subsidy, a subsidy that is justified in substantial part on national defense grounds. It would take emphatic language from Congress to make us conclude that there had been an implied repeal of the "actual tax" doctrine used in the subsidy laws so as to provide a cumulation of benefits. In North Central Airlines, Inc. v. CAB, 124 U.S.App.D.C. 251, 363 F.2d 983 (1966), we held such result was mandated for the investment tax credit, not by the mere passage of the credit in the 1962 amendment to the Internal Revenue Code, but by a 1964 addendum in Section 203(e) of the Revenue Act of 1964, see 26 U.S.C. § 38 note, "Treatment of Investment Credit by Federal Regulatory Agencies" (1964). No such provision was ever inserted for the accelerated amortization deductions.

TWA apparently argues that apart from the inducement to acquire the assets, the Board's ruling is a disincentive in regard to the exercise of the tax option. It may well be that if TWA had fully anticipated the Board's ruling it would not have elected to take accelerated amortization for tax purposes in 1951–1953. As events turned out, its taxes would have been approximately $3,-110,000 greater and its subsidy would have been greater by some $2,859,000. It may be assumed that TWA could have and would have cheerfully sacrificed some $251,000 to be rid of the possibility of heavy tax burdens arriving in the

35. This precise issue was not discussed when the Supreme Court affirmed, but the CAB's general "actual tax" doctrine is entirely in accord with the Supreme Court's tightening of the requirement for a showing of "need." Western Air Lines, Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1954); Delta Air Lines, Inc. v. Summerfield, 347 U.S. 74, 74 S.Ct. 350, 98 L.Ed. 513 (1954).

future at a time when it might have no subsidy program to ease the pain.

This may be assumed for argument, but without a ruling, for it is also arguable that a carrier under subsidy does not have the freedom to wave off a benefit reducing capital requirements that is generally taken by prudent companies operating with their own capital and at their own risk. On that assumption TWA complains that the Board's ruling left TWA $2,859,000 worse off "than if it had never invested in emergency facilities." It would have been more accurate if TWA had said that it is worse off than if it had invested in the facilities but never exercised the tax reduction option. Taking TWA's plight at face value, it results from the understandable inability of TWA to anticipate the *Delta* decision and its consequent good-faith belief that the "actual tax" policy for international subsidy had no relevance to its domestic operations. TWA's plight was in no way induced by any commitment of the Board, and the Board does not have the option to decline to carry out the implications of the *Delta* decision.

### 8. Reduction of need by entire amount of 1946 tax refund.

In 1946 TWA suffered large operating losses and pursuant to the carryback provisions of the Internal Revenue Code sought and obtained a refund of taxes paid during 1944–1945 of a considerable amount, of which $2,623,000, it was stipulated, was allocable to the offset period. When the screening of TWA's operations for 1946 resulted in disallowance of expense items in excess of $1,000,000, this decreased TWA's recognized "need" for that year, and increased "excess earnings" for the offset period. TWA initially argued that its 1946 tax refund should be excluded entirely in ascertaining need for the offset period, since the taxes being refunded were those of 1944–1945, but the Board rejected that argument as leading to an unjustified windfall for the carrier, and it has prudently been abandoned on appeal.

More troublesome is TWA's alternative contention that a substantial portion of the tax refund should be disregarded since it was attributable to expenses that were being disallowed for subsidy purposes. The examiner rejected this contention on the authority of the Board's "actual tax" approach for retrospective determinations, as set forth in the *Western-Inland* case, 14 C.A.B. 201, 243, 251–55 (1951), and never qualified. The Board affirmed this ruling.

TWA's contention is not without force. The essential predicate underlying the Board's conclusion that TWA's "need" was not as great as claimed was its finding that TWA should not have made expenditures of approximately $1,000,000. But the "net" amount that TWA would have saved if it had avoided these expenditures would have been not $1,000,000, but a lower amount, because these expenditures were offset, to some extent, by a tax refund that in effect accompanied them and could not have been obtained in like amount if such expenditures had not been made.

 TWA correctly points out that in administrative proceedings the Board "cannot blow hot and cold" and take inconsistent positions at the same time, any more than a party may. Callanan Road Improvement Co. v. United States, 345 U.S. 507, 513, 73 S.Ct. 803, 97 L.Ed. 1206 (1953). See West Ohio Gas Co. v. Public Util. Comm. of Ohio (No. 1), 294 U.S. 63, 71, 55 S.Ct. 316, 79 L.Ed. 761 (1935), where Justice Cardozo said that even though a commission has a choice of methods of ascertaining expenses it cannot simultaneously operate on inconsistent premises, even in separate proceedings, without being subject to the charge of exercise of arbitrary power, at variance with the "rudiments of fair play."

We may assume, without deciding, that in a conventional rate-making proceeding based on a forecast of future revenues and expenses, typically by extrapolation from a "test year," a commission could not at one and the same time construct a statement based on, say, $1 million expenses, and a tax payable element of cost of service lower than would be required with such expenses because it inconsist-

ently assumed greater expenses would be incurred.

■ We repeat, however, that we are dealing with a determination of subsidy required from the Government and not rates fairly chargeable to consumers. It seems plain enough that Congress could constitutionally have specified that subsidy applicants must operate with punctilious prudence, at the risk of being chargeable out of income after taxes for disbursements unwarranted in kind or amount. An express provision for an "actual tax" policy could not be thwarted by a complaint against the theoretically inconsistent premises.

The only question, then, is the validity of the administrative determination that this is what Congress meant. The Board's 1951 "actual tax" approach in *Western-Inland* took into consideration and rejected an argument of the carriers not unlike that presented by TWA. *See* 14 C.A.B. at 253:

> The carriers' view is that not only does the airline suffer the usual disallowance of expenses incurred and paid in the course of business, but not recognizable for rate-making purposes, it also fails to receive the tax allowance which under the constructive method helps cushion the effect of such disallowances. * * * The constructive method is thus revealed as a convenient vehicle for reimbursing carriers for substantial parts of funds disallowed by the Board in accordance with the rate-making standards of the Act. The carriers characterize the denial of this kind of reimbursement as "punishing" the carrier. On the contrary, we consider such allowances gratuities which we can no longer tolerate.

On appeal this court affirmed the "actual tax" ruling for determination of "need" on tax payments actually made as being an administrative action having an appropriate "basis in fact." *Summerfield v. CAB*, 92 U.S.App.D.C. at 254, 207 F.2d at 206 (1953). Although this precise issue was not discussed when the Supreme Court affirmed, its opinion re-

flects approval of a tight showing of "need." *Western Air Lines v. CAB*, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1954). Congress has not indicated disapproval of the rulings of the Board or this court.

■ We see no basis for interjection at this hour to reconsider those rulings. The only possible question is whether the "actual tax" approach used to reduce need because tax liability was little or nothing, also applies when need is reduced by the offset of tax refunds. We see no basis for a distinction. If anything the tax refund dramatizes the point that the public fisc has already been drawn on to provide to the carrier that made excessive expenditures a (tax refund) payment. There is no requirement that this be ignored or that blinders be worn by the agency that specifies the amount of the subsidy check.

Affirmed.